COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
|---|---|---|
| JESSE AROCHA, | | No. 08-07-00108-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 399th District Court |
| | § | |
| THE STATE OF TEXAS, | | of Bexar County, Texas |
| | § | |
| Appellee. | | (TC # 2006CR0870A) |
| | § | |

## O P I N I O N

Jesse Arocha appeals his conviction of burglary of a habitation. A jury found him guilty and the trial court assessed punishment at a fine of $1,500 and imprisonment for six years but suspended the sentence and placed Appellant on community supervision for six years. The Texas Supreme Court transferred the appeal to this Court by docket equalization order entered on April 2, 2007. For the reasons that follow, we affirm.

## FACTUAL SUMMARY

On November 7, 2005, Audrie Herrera took her two youngest children to school at approximately 6:45 a.m. and then dropped her husband off at work at 7 a.m. Herrera's oldest son, twelve-year-old Jeremy, did not join them because he walked to school. After dropping off the children, Herrera went to pay her electric bill and returned home around 8 a.m. Nobody was at her house when she returned and there were no vehicles in the driveway. After entering the house, Herrera noticed that her DVD player was missing. She went into her bedroom and noticed that the closet door and drawers were open as if someone had been looking for something. Upon seeing that some DVDs were also missing, she thought Jeremy might have taken the player and DVDs or loaned

them to one of his friends without asking. Herrera immediately drove to Jeremy's school to speak with him about it before classes started. But Jeremy said he did not know what she was talking about and they went together back to the house. Herrera pulled onto their street about 8:15 a.m. and noticed a gray vehicle in front of her home facing the wrong direction. A darker Hispanic male was in the driver's seat and a lighter Hispanic male was in the rear passenger seat. Both of them were wearing white tee shirts. Herrera also saw an African-American male running from her home toward the gray car and carrying something under his arm. He slid over the trunk and got into the right front passenger seat. Herrera "floored it" and attempted to block the gray vehicle from exiting the cul-de-sac, but she was going too fast and struck the right front quarter panel of the other car, effectively pinning it against the curb. The impact also flattened the right front tire of the gray car. At trial, Herrera made a positive in-court identification of Appellant as the driver. She had seen the faces of the three men who were shocked she had hit their car. Appellant threw the car in reverse and Herrera could hear the tires squealing as he tried to get away. The gray car was finally freed and it left, although one of its hubcabs had fallen off as a result of the collision. Herrera told Jeremy to run to the neighbors and call 911, and she ran after the gray car to see in which direction it had gone. The police arrived quickly. Herrera described the vehicle and the three men, and told the officers the direction in which they were traveling. Herrera went inside her home with the officers and found a broken kitchen window in the rear of the house. She also discovered that several music CDs, her son's Playstation, and a pink pillowcase were also missing. She told the police what items had been taken in the burglary. After a few minutes, the officers escorted Herrera and her son to a nearby apartment complex and asked whether she recognized any of the vehicles there. Herrera saw the gray Honda and told the officers it was the same car. The officers then told her they had three suspects in custody. While Herrera and Jeremy sat in the back seat of a patrol car, the police brought

the suspects into view one-by-one and they viewed each suspect from a distance of about twenty feet. She and Jeremy identified the three men as the same ones they had seen just minutes before at their house. Basing her identification on his face, Herrera identified Appellant as the driver. The police later showed Herrera numerous items of property recovered from the gray Honda. She identified the following as her property taken in the burglary: thirty-five DVD movies, five Playstation games, forty-two music CDs, two CD players, earphones, a Cyberhome DVD player, and a pink pillowcase.

Officer Thomas Jefferson of the San Antonio Police Department was dispatched to Herrera's house and he spoke with her about the morning's events. She told him her home had been burglarized and she had struck their car with her car as they tried to leave. Herrera also provided a description of the three suspects. The first suspect was a black male wearing a white shirt and black headband or "do-rag" whom she saw leave her home and get into the front passenger seat of a gray Honda Civic. The second suspect was the driver, and the third suspect was sitting in the rear passenger seat. Jefferson immediately put out over the radio the description of the suspects, the vehicle, and the direction they were traveling. Jefferson remained at the house with Herrera to preserve evidence and he continued to gather information about the burglary and the property taken. Five to seven minutes after making the radio report, a police officer notified Jefferson that he had made contact with possible suspects and a vehicle matching Herrera's description at a nearby apartment complex. Jefferson took Herrera and her son to the complex and she identified a gray Honda. Herrera and her son first viewed Joseph Stewart, an African American male, and both identified him as the person seated in the front passenger seat. They next viewed Appellant and both identified him as the driver. Finally, the officers presented Jacob Lao and Herrera and Jeremy identified him as the person seated in the back seat of the Honda.

Officer Eduardo Rodriguez of the San Antonio Police Department was dispatched to a

burglary in progress and he arrived in approximately one minute. Herrera told him that two Latin males and one black male had fled in a gray Honda. She also stated that the vehicle had damage to its right front quarter panel and a flattened tire and she indicated the direction in which the gray Honda had traveled when the suspects fled. Rodriguez could see that the suspects' vehicle had left a trail for him to follow because the rim was making contact with the asphalt. Rodriguez followed the trail to an apartment complex located near Herrera's house. Looking at the vehicles in the parking area, Rodriguez quickly found a gray Honda Civic with damage to the right front quarter panel and two Hispanic males were changing the right front tire. Rodriguez also noticed that the hubcap was missing. Rodriguez identified Appellant as one of the two males. As Rodriguez exited his patrol car and approached, both Appellant and the other male, Jacob Lao, appeared extremely nervous and kept asking Rodriguez why he was there. Fearing Appellant and Lao might flee, Rodriguez handcuffed them. Other officers found the third suspect, Joseph Stewart, in the apartment complex.

Jose Arias, a crime scene technician with the San Antonio Police Department, photographed and processed evidence at Herrera's home and at the apartment complex. Arias collected the hubcap which had been torn off of the suspect vehicle and left in the street near Herrera's car. When Arias processed the gray Honda at the apartment complex, he found items which matched the complainant's description of property taken in the burglary. He took the property to Herrera's home and she identified it as the property taken during the burglary that morning. Arias also processed for fingerprints the complainant's home, the recovered property, and the gray Honda. He collected three latent print cards from the exterior surface on top of the trunk lid, two latent print cards from the exterior surface of the Honda's right rear window, and one on the window screen at the burglars' point of entry into the home.

Vernon Ginn, a fingerprint examiner, matched the latent print taken from the exterior trunk of the gray Honda with the known print of Joseph Stewart, the individual both Herrera and Jeremy described as leaping and sliding across the trunk as he fled. Ginn was unable to match any of the other latent prints.

Jeremy Vasquez, the complainant's son, testified at trial. Everyone else in the family had already left the house when Jeremy left for school around 7:30 a.m. He was hanging out with his friends before school started when his mother approached and asked what he had done with the DVD player. He told her he did not know what she was talking about so she took him to the car and they drove back home. While they were stopped at a light, they could see a silver Honda Civic parked in front of their house. His mother did not recognize the car and she sped toward the house. Just as they got close, they saw a black male with something under his right arm running from their front porch toward the silver Honda. The black male was wearing a black "do-rag" on his head. After the black male got in the Honda, Jeremy's mother hit the car but the driver was able to get the car in reverse and leave. His mother could not follow them because the wheel had fallen off the car. The silver Honda also had a flat tire. Jeremy called 911 from a neighbor's house and the police arrived in a few minutes. Within five or ten minutes, the police took Jeremy and his mother to an apartment complex to view some suspects. Nobody suggested to Jeremy or his mother that these were the same men who had burglarized his house. Jeremy viewed three suspects one-by-one and identified them as the same three men he had seen just minutes earlier at his home. Jeremy also made an in-court identification of Appellant as the driver of the silver Honda. When challenged about his identification, Jeremy said he was sure that Appellant was the driver.

Joseph Stewart testified on Appellant's behalf at trial. He admitted committing the burglary of the Herreras' home on November 7, 2005. At the time, Stewart was living in Floresville but he

also lived in an empty apartment at the complex where they were arrested. Stewart owned the gray Honda used during the commission of the burglary. Stewart knew Appellant through Jacob Lao but he considered Appellant as only an acquaintance. Stewart did not have any money so he decided to commit a burglary. Lao drove Stewart's car while Stewart sat in the front passenger seat. Stewart picked the Herreras' house at random. Lao dropped Stewart off at the house and he burglarized it while Lao drove the car back to the apartment complex and waited for him. Stewart returned to the apartment complex and Lao picked him up so they could return to the house. At the house, a car driven by a woman rammed them but they were able to back up and get away even though the Honda had a flat tire. They went to the opposite side of the apartment complex where Appellant lived because they knew they could not be seen from the house Stewart had just burglarized. Stewart wanted to fix the tire as fast as he could and leave the area because he knew the police would be looking for him. Stewart was too nervous to change the tire so Lao asked Appellant to help him while Stewart went to the apartment. The police came for Stewart and took him to an area in the complex to be identified. Stewart told the police that only one other person was involved in the burglary with him and he gave a written statement indicating that Appellant did not participate in the burglary. On his judicial confession made when he entered his guilty plea, Stewart crossed out the sentence in which he admitted acting in concert and as a party with Lao and Appellant. During cross-examination, the prosecutor established that as part of his guilty plea, Stewart had stipulated that the police reports were correct. Those reports indicated that Appellant had committed the burglary with Stewart and Lao. Stewart was unaware that Lao had accepted responsibility for his part in the burglary and had implicated Appellant in the commission of the burglary.

Veronica Rodriguez, Appellant's former girlfriend, testified that Appellant spent the night with her on November 7, 2005. Rodriguez lived with Eloise Andrade at the apartment complex.

Andrade's boyfriend, Junior, was also at the apartment. Appellant took Andrade's children to school the next morning and then returned to the apartment at around 7:45 or 8 a.m. At first, Veronica said that Andrade's mother arrived to give Andrade a ride to work and mentioned that the police were at the apartment complex. Then stating that she was confused, Veronica corrected her testimony to say that sometime after 8 a.m., Jacob Lao knocked on the door and asked to use the phone because he needed help changing a flat tire. Veronica noticed that Lao was frantic and she told Appellant to help him. After a little while, Andrade's boyfriend, Junior, left to throw out the trash and saw that the police were arresting Appellant, Lao, and Stewart. Veronica tried to tell the police that Appellant had been with her that morning, but they would not listen to her and told her to leave or they would arrest her. Veronica testified on Appellant's behalf because he had always been there for her. After Appellant's arrest, Veronica did not make any effort to tell anyone that Appellant had been with her that morning because she got back together with her boyfriend and had a baby. A court-appointed investigator "tracked [her] down" and she gave a written statement on August 1, 2006.

The court's charge included an instruction on the law of parties and the application paragraph asked the jury to determine whether Appellant was guilty of burglary of a habitation as either the primary actor or as a party. The jury rejected Appellant's alibi defense and found him guilty of burglary of a habitation. The trial court assessed Appellant's punishment at a fine of $1,500 and imprisonment for six years but suspended the sentence and placed Appellant on community supervision for six years. The Texas Supreme Court transferred the appeal to this court by order entered on April 2, 2007.

**JURISDICTIONAL CHALLENGE**

In his first four issues, Appellant challenges the jurisdiction of this court over his appeal. He first argues that Section 73.001 of the Government Code is unconstitutional and violative of the

Equal Protection Clause because it does not give proper effect to Texas voters who elect the justices of the intermediate appellate courts. Second, he contends we do not have jurisdiction of this appeal because the Supreme Court's transfer order is unconstitutional due to a conflict between the Texas Constitution and Chapter 73 of the Government Code. Third, Appellant claims jurisdiction is absent because the transfer order violates the equal protection and due course of law provisions of the Texas Constitution. Finally, Appellant maintains that the transfer order is unconstitutional because it is a void exercise of legislative authority over the judiciary in violation of the Separation of Powers provision found in Article 2, Section 1 of the Texas Constitution. He asks us to transfer the case back to the Fourth Court of Appeals.

To preserve a complaint for appellate review, a party must raise the issue by a timely and specific objection or motion. *See* TEX.R.APP.P. 33.1(a). Even constitutional errors may be waived by failure to object. *Wright v. State*, 28 S.W.3d 526, 536 (Tex.Crim.App. 2000); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex.Crim.App. 1995). Generally a party on appeal is seeking to raise a complaint about some ruling of the trial court. In this case, however, Appellant is complaining about an action of the Texas Supreme Court after he filed his notice of appeal to the Fourth Court of Appeals. The issues we must decide are whether Appellant is obligated to preserve his complaints about the transfer order and the constitutionality of Section 73.001, as applied to him, and if so, how does he preserve the error?

The Supreme Court transferred several appeals, including the instant appeal, to this court pursuant to Section 73.001 of the Texas Government Code. That section provides:

> The supreme court may order cases transferred from one court of appeals to another at any time that, in the opinion of the supreme court, there is good cause for the transfer.

TEX.GOV'T CODE ANN. § 73.001 (Vernon 2005). Although the authority granted to the Supreme

Court by Section 73.001 is typically exercised to equalize the dockets of the intermediate appellate courts, the statute does not limit the Supreme Court's authority to that purpose. *Miles v. Ford Motor Company*, 914 S.W.2d 135, 137 (Tex. 1995).

Appellant states his issues in terms of a challenge to our jurisdiction. Generally, a party is not required to preserve a challenge to the court of appeals' jurisdiction which is defined by the Texas Constitution and by statute. *See* TEX.CONST. art. V, § 1 (courts in which judicial power is vested), TEX.CONST. art. V, § 6[1] (courts of appeals); TEX.GOV'T CODE ANN. § 21.001 (Vernon 2004)(inherent power and duty of courts), TEX.GOV'T CODE ANN. § 22.220 (civil jurisdiction), TEX.GOV'T CODE ANN. § 22.201 (Vernon Supp. 2008)(courts of appeals districts), TEX.GOV'T CODE ANN. § 22.221 (writ power), TEX.GOV'T CODE ANN. §§ 73.001-73.002 (transfer of courts of appeals' cases); TEX.CODE CRIM.PROC.ANN. art. 4.01 (Vernon 2005)(providing that courts of appeals have jurisdiction in criminal actions); TEX.CODE CRIM.PROC.ANN. art. 4.03 (providing that "[t]he Courts of Appeals shall have appellate jurisdiction coextensive with the limits of their respective districts in all criminal cases except those in which the death penalty has been assessed."). Section 73.002 specifically provides:

(a) The court of appeals to which a case is transferred has jurisdiction of the case without regard to the district in which the case originally was tried and to which it is

---

[1] Article V, Section 6 of the Texas Constitution provides:

Sec. 6. (a) The state shall be divided into courts of appeals districts, with each district having a Chief Justice, two or more other Justices, and such other officials as may be provided by law. The Justices shall have the qualifications prescribed for Justices of the Supreme Court. The Court of Appeals may sit in sections as authorized by law. The concurrence of a majority of the judges sitting in a section is necessary to decide a case. Said Court of Appeals shall have appellate jurisdiction co-extensive with the limits of their respective districts, which shall extend to all cases of which the District Courts or County Courts have original or appellate jurisdiction, under such restrictions and regulations as may be prescribed by law. Provided, that the decision of said courts shall be conclusive on all questions of fact brought before them on appeal or error. Said courts shall have such other jurisdiction, original and appellate, as may be prescribed by law.

TEX.CONST. art. V, §6.

returnable on appeal.

Even if Section 73.001 is unconstitutional as applied to Appellant, we would not be divested of jurisdiction. Accordingly, we conclude that Appellant is not excused from preserving the constitutional arguments he raises with respect to the transfer order.

The Texas Supreme Court has established that the proper procedure for obtaining a transfer is by motion:

> The party requesting a transfer should file a copy of the motion to transfer in each of the two courts of appeals, asking that, when the motion is forwarded to the Supreme Court, each court of appeals advise the Supreme Court in writing whether it has any objection to the proposed transfer. Any briefs in favor of the proposed transfer should also be filed in each court of appeals and forwarded with the transfer motion. We will then have the motion, the briefs, and the comments of the two courts of appeals in determining whether to grant the motion to transfer.

*Miles*, 914 S.W.2d at 137 n.2.

Citing *Miles*, the State maintains that Appellant has not followed the proper procedure for seeking transfer of his case back to the Fourth Court of Appeals. In his reply brief, Appellant responds that he should not have to "acquiesce" to the authority of the Supreme Court in order to have his "criminal law matter" transferred back to the Fourth Court of Appeals. But he fails to recognize that if he had followed the established procedure and the Supreme Court had granted his motion and transferred the appeal back to the Fourth Court of Appeals, his complaints about the constitutionality of Section 73.001 would be completely remedied. That is the very purpose of requiring a timely and specific objection. If, on the other hand, the Supreme Court denied his motion, then we would be in a position to address the constitutional issues he raises. Because Appellant has refused to avail himself of an established procedure which potentially could remedy the alleged constitutional violations, we conclude that he has failed to preserve his complaints about the transfer of his appeal. Having said that, we pause to note that we share some of Appellant's

concerns about the docket equalization process. To some extent, recent rule amendments have improved the situation.[2] And we applaud both defense counsel and the State for their excellent briefing and arguments on these issues. But because the issues are not ripe for our review, we must overrule Issues One through Four.

## FACTUAL SUFFICIENCY OF THE EVIDENCE

In Issue Five, Appellant challenges the factual sufficiency of the evidence supporting his conviction of burglary. More specifically, he argues the evidence is factually insufficient to prove his identification because the identification procedure was unduly suggestive and rendered the in-court identification by Herrera and Jeremy untrustworthy.

### *Standard of Review*

A factual sufficiency review begins with the presumption that the evidence supporting the conviction is legally sufficient. *Clewis v. State*, 922 S.W.2d 126, 134 (Tex.Crim.App. 1996). In

---

[2] Effective September 1, 2008, Rule 41.3 was added to the Texas Rules of Appellate Procedure:

41.3. Precedent in Transferred Cases.
In cases transferred by the Supreme Court from one court of appeals to another, the court of appeals to which the case is transferred must decide the case in accordance with the precedent of the transferor court under principles of stare decisis if the transferee court's decision otherwise would have been inconsistent with the precedent of the transferor court. The court's opinion may state whether the outcome would have been different had the transferee court not been required to decide the case in accordance with the transferor court's precedent.

The Comment to the 2008 change provides:

Subdivision 41.3 is added to require, in appellate cases transferred by the Supreme Court under Section 73.001 of the Government Code for docket equalization or other purposes, that the transferee court must generally resolve any conflict between the precedent of the transferor court and the precedent of the transferee court--or that of any other intermediate appellate court the transferee court otherwise would have followed--by following the precedent of the transferor court, unless it appears that the transferor court itself would not be bound by that precedent. The rule requires the transferee court to "stand in the shoes" of the transferor court so that an appellate transfer will not produce a different outcome, based on application of substantive law, than would have resulted had the case not been transferred. The transferee court is not expected to follow the transferor court's local rules or otherwise supplant its own local procedures with those of the transferor court.

reviewing factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App. 2000); *Clewis*, 922 S.W.2d at 129. In reviewing legal and factual sufficiency challenges, we consider all of the evidence, whether admissible or inadmissible. *Powell v. State*, 194 S.W.3d 503, 507 (Tex.Crim.App. 2006); *Marshall v. State*, 210 S.W.3d 618, 625 (Tex.Crim.App. 2006). We determine whether the fact finder was rationally justified in finding guilt beyond a reasonable doubt. *Watson v. State*, 204 S.W.3d 404, 415 (Tex.Crim.App. 2006). The fact finder is the exclusive judge of the witnesses' credibility and the weight to be given their testimony. *Swearingen v. State*, 101 S.W.3d 89, 97 (Tex.Crim.App. 2003). Further, the reviewing court must give due deference to the fact finder's determinations. *Johnson*, 23 S.W.3d at 10-12. The judgment should not be set aside unless the evidence supporting the verdict is so weak as to be clearly wrong and manifestly unjust or the verdict is against the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 411.

*Identification*

To prove burglary of a habitation, the State must prove beyond a reasonable doubt that the defendant entered a habitation without the owner's consent and with the intent to commit a felony, theft, or assault. TEX.PENAL CODE ANN. § 30.02(a)(1)(Vernon 2003). The State must prove beyond a reasonable doubt that the defendant is the person who committed the charged offense. *Johnson v. State*, 673 S.W.2d 190, 196 (Tex.Crim.App. 1984). The indictment alleged that Appellant intentionally and knowingly entered a habitation without Audrie Herrera's consent and with the intent to commit theft. An individual can be charged as a party to an offense and can be held criminally responsible for the conduct of another when that individual acts in concert with another person in committing an offense. TEX.PENAL CODE ANN. §§7.01-7.02 (Vernon 2003).

Circumstantial evidence alone may be used to prove that a person is a party to an offense. *Beardsley v. State*, 738 S.W.2d 681, 684 (Tex.Crim.App. 1987). Furthermore, a person can be convicted as a party even if the indictment does not explicitly charge him as a party. *Marable v. State*, 85 S.W.3d 287, 288 (Tex.Crim.App. 2002). An individual can be guilty of burglary of a habitation even though he does not personally enter the burglarized premises if he is acting together with another in the commission of the offense. *Powell v. State*, 194 S.W.3d 503, 507 (Tex.Crim.App. 2006). The court's charge included an instruction on the law of parties and the application paragraph applied the law of parties to the facts of this case.

*Review of the Evidence*

Appellant did not file a motion to suppress the in-court identification or object to his in-court identification by either Herrera or Jeremy. Therefore, the in-court identification by these witnesses is not subject to suppression in the context of this factual sufficiency challenge and we will not review the admissibility of the in-court identification. Stated differently, a determination that the witnesses' identifications were based on an impermissibly suggestive pretrial procedure would not render the evidence insufficient.

Herrera and her son Jeremy both had an opportunity to view Appellant immediately after Herrera crashed her car into the gray Honda Civic. Herrera and Jeremy provided a description of the suspects and their car to the police. Within minutes, the police found a car and three suspects which matched the descriptions provided by Herrera and Jeremy. A police officer took Herrera and Jeremy to the apartment complex and Herrera identified the gray Honda as the same car she had hit. Both Herrera and Jeremy had an opportunity to view Appellant at the apartment complex and both identified him as the driver of the car. At trial, each of these witnesses made an in-court identification of Appellant as the driver of the gray Honda and they remained firm in their

identification even in the face of cross-examination. Appellant presented two witnesses at trial, his co-defendant Stewart and his former girlfriend Veronica Rodriguez, who testified that Appellant did not participate in the burglary. It was the jury's task to weigh the credibility of all the witnesses and to resolve this conflict in the evidence. The jury resolved these issues against Appellant and rejected his alibi defense. We conclude that the evidence is factually sufficient to prove that Appellant is the person who committed the charged offense. Issue Five is overruled.

## COMMENT BY TRIAL COURT

In his final issue, Appellant complains that the trial court erred in commenting during defense counsel's opening statement. The State responds that any error is waived because Appellant failed to object.

Counsel argued that the identification of Appellant was based solely on the testimony of Herrera and Jeremy and that they were mistaken. The State objected that this amounted to argument rather than a summation of the evidence they intended to present. The trial court did not rule on the objection and instructed defense counsel to proceed. The following then occurred:

> [Defense counsel]: So, hopefully, our witnesses will be able to clarify a lot of that information. Now, ladies and gentlemen, you need to remember what the burden of proof is here. The burden of proof is how much the district attorney's office has to prove to you-all or conviction you all of the truthfulness of what happened on this particular day.

> [The prosecutor]: That's an incorrect statement, as well. Our burden is beyond a reasonable doubt. It's up to them to make that determination.

> [Defense counsel]: I'm sorry, Kathy. I was getting there. Their particular burden in this type of case is beyond a reasonable doubt. Now, beyond a reasonable doubt can mean a lot of things to every person. I mean, every person has a different opinion. You know, if I ask what the color of my shirt was? Everybody would probably say something different. There's a name for everything. There's mauve, purple, dark blue, whatever. Everyone has a different opinion, except in this particular instance, beyond a reasonable doubt has to be something extremely convincing to yourself.

[The prosecutor]: Again, I'm going to object to this. There's no definition. She's interjecting a definition. I apologize for the discrepancy. There's a proper instruction to the jury. The jury is given a chance at the end, and there's not a definition, and I'm objecting to any suggestion of what the definition is; there is none.

[Defense counsel]: Your Honor, that's what I'm saying, that every individual has a different opinion.

[The Court]: Ladies and gentlemen of the jury --

[The prosecutor]: And it's argumentative.

[The Court]: -- a reasonable doubt is a doubt based on reason, and we have to rely on your individual sense of reason, sense of reason that each of you possess. Each of you must decide for yourselves whether there is a reasonable doubt or whether there is not. Go ahead, please.

Defense counsel did not object to the trial court's statement but instead proceeded with the opening statement.

A party must bring an error to the trial court's attention by a timely and specific motion or objection. TEX.R.APP.P. 33.1. The contemporaneous objection rule applies to allegedly improper comments by the trial judge. *See Fuentes v. State*, 991 S.W.2d 267, 276 (Tex.Crim.App. 1999) (failure to object to trial court's comments constituted waived); *Beltran v. State*, 99 S.W.3d 807, 811 (Tex.App.--Houston [14th Dist.] 2003, pet. ref'd)(holding defendant failed to preserve error with respect to trial court's comments because defendant failed to object). Appellant argues, however, that the trial court's comment was so egregious that an instruction would not have cured the error, and therefore, he was excused from objecting. Appellant cites no authority in support of his contention that he is excused from preserving error. Further, he does not argue that the trial court's comments rise to the level of fundamental error, taint the presumption of innocence, or vitiate the jury's impartiality. *See Jasper v. State*, 61 S.W.3d 413, 421 (Tex.Crim.App. 2001). Because Appellant failed to object to the trial court's comments, we find that he waived error. Issue Six is

overruled.  Having overruled each issue presented for review, we affirm the judgment of the trial court.

June 30, 2009

_____
ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Carr, JJ.
Carr, J., not participating

(Do Not Publish)