**Ray JASPER, Appellant,**

v.

**The STATE of Texas.**

**No. 73,817.**

Court of Criminal Appeals of Texas.

Nov. 28, 2001.

18. *Id.* at 821–22, 110 S.Ct. 3139 (*citing State v. Kuone*, 243 Kan. 218, 757 P.2d 289, 292–93 (1988)).

19. *Schaal*, 233 F.3d at 1108.

20. *Id.*

21. *Id.*

22. *Id.*

23. *Webb*, 44 F.3d at 1392.

24. *Schaal*, 233 F.3d at 1108.

25. *Wright*, 497 U.S. at 822, 110 S.Ct. 3139.

414

Michael C. Gross, San Antonio, for Appellant.

Michael P. Miklas, III, Assistant District Attorney, San Antonio, for the State.

## OPINION

MEYERS, J., delivered the opinion of the Court, joined by KELLER, P.J., PRICE, JOHNSON, HOLCOMB, and COCHRAN J.J.

Appellant was convicted in January 2000 of capital murder. TEX. PEN.CODE ANN.

§ 19.03(a). Pursuant to the jury's answers to the special issues set forth in Tex.Code Crim. Proc. Ann. art. 37.071 §§ 2(b) and 2(e), the trial court sentenced appellant to death. Art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant raises five points of error including a challenge to the sufficiency of the evidence supporting the jury's finding that appellant would be a continuing threat to society. *See* Article 37.071 § 2(b). The sufficiency point will be addressed first. We affirm.

David Alejandro owned and operated a music recording studio where musicians could have their music professionally recorded for a fee. This business required the use of various pieces of electronic equipment such as computers, soundboards and microphones. Appellant and some of his friends frequently recorded their rap music at the studio. At some point, appellant decided to steal Alejandro's equipment in order to make money from its sale. Aware that Alejandro would be able to identify him, appellant also decided to kill Alejandro so that there would be no witnesses. He enlisted the help of two friends to assist in removing the heavy equipment from the studio.

On November 21, 1998, appellant purchased large bags from an Academy store. A week later, he and his accomplices drove two vans to Alejandro's studio. Appellant and one accomplice carried concealed knives. The three had made an appointment at the studio and spent about two hours there while Alejandro recorded their music before they decided it was time to kill him. Appellant slashed Alejandro's throat from ear to ear, but did not kill him. Appellant and one accomplice continued to attack Alejandro until he died as a result of multiple stab wounds to his chest and abdomen. Appellant covered the body with a sheet taken earlier from appellant's bed, and the group began loading equipment into the vans. Appellant fled on foot when an off-duty police officer arrived to investigate the scene, but was apprehended days later outside his home.

On December 2, 1998, appellant confessed to police that he had planned the crime and recruited two accomplices. His confession describes events in detail that were later corroborated by appellant's girlfriend, Christina Breton, police officers, security guards, and physical evidence discovered by investigators. Breton testified that several days before the commission of the crime, appellant had told her about his plan to steal Alejandro's equipment and kill him.

During the punishment phase of the trial, the State introduced evidence of appellant's criminal history and bad acts, beginning at age fifteen, including offenses and bad acts such as theft of a bicycle, drug possession, attempted burglary, and an incident of violence against an off-duty police officer.

In his third point of error, appellant claims the evidence presented was legally insufficient to support the jury's finding that he would constitute a continuing threat to society. *See* Art. 37.071 § 2(b)(1). The proper standard when reviewing sufficiency of the evidence at punishment requires the court to look at the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed beyond a reasonable doubt that appellant would probably commit criminal acts of violence that would constitute a continuing threat

---

1. Unless otherwise indicated all future references to Articles refer to Texas Code of Crimi- nal Procedure.

to society. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Allridge v. State,* 850 S.W.2d 471 (Tex. Crim.App.1991), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). We have also held that the facts of the crime alone can be sufficient to support an affirmative finding to the special issue. *Allridge,* 850 S.W.2d at 488. A jury may infer future dangerousness from the brutality and depravity of the crime committed by a criminal defendant. *Trevino v. State,* 991 S.W.2d 849, 854 (Tex.Crim.App. 1999).

The facts of this crime were brutal and demonstrated calculated deliberation. Appellant planned well in advance the stabbing murder of someone he would later describe as "one of the nicest people [he] ever met in [his] life." He allowed Alejandro to assist him with recording for two hours, knowing he was about to kill him. As Alejandro sat unaware at the soundboard mixing a track for appellant, appellant pulled his head back and, taking a kitchen knife from his jacket, slit his throat from ear to ear. When that wound did not kill him, one of appellant's accomplices joined the attack until Alejandro was dead. Alejandro suffered twenty-five stab wounds. Appellant quickly loaded equipment into the vans and instructed one stunned accomplice to hurry up and help.

In addition to the facts of the crime itself, evidence adduced at trial of prior criminal history and lack of remorse support the jury's finding. Appellant's criminal history included incidents beginning at the age of fifteen, when he stole a bicycle. He was expelled from school for possession of marijuana and expelled from alternative school. More recently, he attempted a residential burglary and attacked the off-duty police officer who attempted to

detain him and also attempted to evade police at a traffic stop, leading them on a high-speed chase. The evidence introduced by the State at trial shows a pattern of escalating criminal activity and an increasing proclivity to break laws posing threats to the safety of others. Furthermore, the evidence showed a lack of remorse. Immediately after killing Alejandro, appellant began loading the vans. At the punishment phase of the trial, when asked if he had anything to say to Alejandro's family, appellant replied that he wanted the family to know that he did not kill Alejandro because, according to the autopsy, the only wound he claims to have been inflicted by his hand (slicing the victim's throat, as opposed to the twenty-five stab wounds), was not enough to kill him.

Based on the facts of the offense and other evidence of escalating criminal activity and lack of remorse, a rational jury could have found beyond a reasonable doubt that appellant would continue to be a threat to society. Accordingly, we hold the evidence legally sufficient to support the jury's affirmative answer to the future dangerousness special issue. Point of error three is overruled.

█ In point of error one, appellant claims the trial court reversibly erred in failing to rule that appellant was married to a key state witness, Christina Breton. Facts adduced at trial showed that Breton had been living with appellant at his parents' home since the age of fifteen and that the two had a child together. While there has been no marriage ceremony, appellant claims he and Breton were informally married at the time of her testimony. If appellant and Breton were married, Texas Rule of Evidence 504, *Husband Wife Privileges,* would have been applicable.[2]

---

**2.** Under Rule 504(a), *Confidential Communication Privilege,* an accused has a privilege

"to refuse to disclose and to prevent another from disclosing confidential communication

The existence of an informal marriage may be proven in a judicial proceeding one of two ways. There can be a showing that a declaration of marriage has been signed. If there is no declaration, there must be evidence that the man and woman first agreed to be married and then lived together in Texas as husband and wife while representing to others that they were married. Tex. Fam.Code § 2.401(a)(1)(2) (Vernon 1998).[3] In a hearing outside the presence of the jury, appellant's trial attorney attempted to prove the latter. At the end of the hearing, the trial judge informed appellant that he thought all the evidence had shown was an agreement to be married in the future. Breton was subsequently called by the State to testify.

 In order to determine the appropriate standard of review to apply when reviewing a trial court's ruling involving "mixed questions of law and fact," it is important to determine whether or not the trial court's resolution of those questions turns on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). If the resolution turns on an evaluation of credibility and demeanor, then appellate courts should afford almost total deference to the trial court's finding of fact and view the evidence in the light most favorable to the trial court's ruling. When, however, the ultimate resolution of "mixed questions of law and fact" does not turn on an evaluation of credibility and demeanor, then appellate courts may decide to review the trial court's decisions *de novo.* *Id.* Since it is apparent from the record that in the present case the trial court reached its decision by evaluating the credibility of the witnesses, we will view the evidence in the light most favorable to the court's ruling. *See id.*

Four witnesses were called by appellant to testify about the alleged informal marriage between appellant and Breton. The witnesses at the hearing provided contradictory testimony. For example, although Breton testified that she and appellant held themselves out as husband and wife, she also referred to appellant as her boyfriend. Reverend Patterson, appellant's family pastor, was also called to the stand. Like Breton, Reverend Patterson provided

---

made to the person's spouse while they were married." Rule 504(b), *Privilege Not to Testify in Criminal Case*, provides that "[i]n a criminal case, the spouse of the accused has a privilege not to be called as a witness for the state." Tex.R. Evid 504(a)(b).

**3.** Section 2.401, *Proof of Informal Marriage*, provides:
 (a) In a judicial, administrative, or other proceeding, the marriage of a man and woman may be proved by evidence that:
 (1) a declaration of their marriage has been signed as provided by this subchapter; or
 (2) the man and woman agreed to be married and after the agreement they lived together in this state as husband and wife and there represented to others that they were married.
 (b) If a proceeding in which a marriage is to be proved as provided by Subsection (a)(2) is not commenced before the second anniversary of the date on which the parties separated and ceased living together, it is rebuttably presumed that the parties did not enter into an agreement to be married.
 (c) A person under 18 years of age may not:
 (1) be a party to an informal marriage; or
 (2) execute a declaration of informal marriage under Section 2.402.
 It should be noted that although it was not argued at the hearing, both appellant and the State address the issue in their briefs of whether or not Ms. Breton in fact possessed the legal capacity to enter into an informal marriage. Ms. Breton testified that she did not turn eighteen until after the date appellant was arrested and incarcerated for this offense. Since we are upholding the trial court's ruling in regards to § 2.401(a)(2), further analysis under subsection (c) is unnecessary.

conflicting testimony. Upon questioning by appellant's attorney, Reverend Patterson testified that appellant and Breton held themselves out as being husband and wife. However, he also stated that he considered them to be a couple with intentions of getting married. The third witness called to the stand, appellant's father, was also unclear as to the status of appellant and Breton. On one hand he would refer to Breton as appellant's "soon-to-be wife" but also stated that he considered Breton to have already been his son's wife. The last witness to be called by appellant's attorney was appellant. On direct-examination by his attorney, appellant testified that he considered Breton to be his wife and that he held her out to be his wife to his family and friends. However, during cross-examination, the State produced a bank document dated September 24, 1998, on which appellant referred to Breton as his girlfriend.

After appellant finished questioning his witnesses, the State called appellant's mother to the stand. As with the prior witnesses, her testimony did little to establish whether or not appellant and Breton were informally married. At the conclusion of the hearing, the trial judge ruled that he did not believe the testimony that appellant and Breton held themselves out as husband and wife.

Viewing the evidence in the light most favorable to the trial court's ruling, we agree that the testimony failed to establish that an informal marriage existed between appellant and Breton. Point of error number one is overruled.

■■ In appellant's second point of error, he claims his right to a fair trial by an impartial jury was violated by comments of the trial judge. Appellant did not object, but it is the province of this Court to "take notice of fundamental errors affecting substantial rights although they were not pre-

sented to the court," pursuant to Texas Rule of Evidence 103(d).

Appellant specifically objects to the following two exchanges during trial. In the first, appellant cross-examined a twelve-year-old witness with respect to the witness's identification of appellant. In his statement, the witness said he saw two men who were both six feet tall. Appellant was asked to stand, and the witness admitted that he only looked about five-nine or five-ten.

Defense counsel: And when [appellant] stood up, you said that he looked to be like five-eight or five-nine. You were pretty sure that he was not, in fact, six feet tall -

Court: He said five-nine, five-ten, but go ahead.

Defense counsel: Five-eight, five-nine, five-ten. But you're pretty sure that he is not six feet tall; is that correct?

Witness: He looked like he was pretty tall at the time.

Defense counsel: If that was in fact him. It could have been—

Witness: Because my cousin is like around six feet tall, and my brother too, and he looked the same size as my brother.

Defense counsel: Okay. Okay. As you look at this picture here, does that appear to fairly and accurately represent the Defendant?

(Exhibit proffered to witness).

Witness: Does it look—

Court: Come on, Mr. Reece. Knock it off.

State: I object.

Court: Ladies and gentlemen of the jury, step outside.

The photograph appellant had shown to the witness was not one of appellant, but of another man indicted for his partic-

ipation in the same crime. The second exchange occurred during cross-examination of a later witness.

Defense counsel: Were your conversations with [the State's attorney], were those statements put into written form, to your knowledge?

Witness: I believe so.

Defense counsel: And do you have a copy of those with you?

Witness: No.

Defense counsel: Judge, I request the State to provide a copy if they have a written statement.

Court: I think he told you that they didn't have one.

Defense counsel: I think she indicated that the State—

Court: Ladies and gentlemen of the jury, step outside. If you want to put [the State's attorney] on the stand, we'll be glad to do it.

State: So would I.

(Jury excused).

State's counsel was sworn in and appellant questioned him. When the jury returned, the judge told them, "there's no statement from this witness that have [sic] been reduced to writing."

In *Blue v. State*, 41 S.W.3d 129, 132 (Tex.Crim.App.2000)(plurality op.), a plurality of the Court held that a trial judge's comments "which tainted [the defendant's] presumption of innocence in front of the venire, were fundamental error of constitutional dimension and required no objection." Even if we were bound to follow that plurality opinion, the first interchange of which appellant complains does not rise to this level. It is not improper for a trial judge to interject in order to correct a misstatement or misrepresentation of previously admitted testimony. Further, a trial judge's irritation at the defense attorney does not translate to

an indication as to the judge's views about the defendant's guilt or innocence. The second episode to which appellant objects also lacks those elements that would prejudice the jury to the degree discussed in *Blue*. A trial judge has broad discretion in maintaining control and expediting the trial. These comments were aimed at clearing up a point of confusion. None of the trial judge's comments rose to such a level as to bear on the presumption of innocence or vitiate the impartiality of the jury. Point of error two is overruled.

In his fourth point of error, appellant claims the trial judge reversibly erred in failing to grant appellant's *Batson* challenge to the State's striking of one venireperson. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits race-based jury selection. *Batson, supra.* A *Batson* challenge proceeds by the following steps: First, the defendant makes a prima facie case that a venireperson was excluded on the basis of race. Then, the prosecution must come forth with race-neutral reasons for exercising the peremptory challenge. The defendant has the opportunity to rebut those reasons. The burden of persuasion remains with the defendant. Finally, the judge rules on whether the neutral reasons given for the peremptory challenge were contrived to conceal racially discriminatory intent. *Keeton v. State*, 749 S.W.2d 861, 868 (Tex.Crim.App.1988).

In the instant case, the State presented various facially race-neutral reasons for exercising its peremptory challenge against the venireperson in question. Appellant claims that the trial court's determination that those reasons were sufficient should be overturned. Because a trial court is in a unique position to make

such a determination, the judge's decision is accorded great deference and will not be overturned unless it is clearly erroneous. *Ladd v. State,* 3 S.W.3d 547, 563 (Tex. Crim.App.1999), *cert. denied,* 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000).

During voir dire examination, the venireperson responded to questions from the prosecutor that he could not "play the role of God" or "send nobody [sic], you know, to death." When asked if he could answer the special issues in such a way as to dictate the death penalty, he replied, "I don't believe I can, but if I have to, I can make a decision." The prosecutor cited this response as one reason for his peremptory challenge. The fact that a venireperson vacillates as to whether or not he or she is capable of imposing the death penalty despite personal beliefs is a valid and neutral reason to strike that person. *See id.* Furthermore, a number of answers to questions in the venireperson's written questionnaire indicated that he would require the State to prove a criminal history, and stated his belief that the death penalty is misused and used too often, is never justified, and is not an acceptable method for dealing with crime. Although appellant was able to rehabilitate him to some extent during voir dire examination, the venireperson continued to qualify his answers, and the prosecutor testified that he noticed mannerisms demonstrating uncertainty with some answers elicited by defense counsel. Numerous written answers in the pre-voir dire questionnaire indicating a bias against the imposition of the death penalty can constitute a valid reason to exercise a peremptory challenge. *See Adanandus v. State,* 866 S.W.2d 210, 224 (Tex.Crim.App. 1993), *cert. denied,* 510 U.S. 1215, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994). The trial court's determination is accorded great deference and will not be overturned on appeal unless it is clearly erroneous. *See Chamberlain v. State,* 998 S.W.2d 230, 236 (Tex.Crim.App.1999), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000). The record supports the prosecutor's reasons for exercising a peremptory challenge against the venireperson in question. After viewing the evidence in the light most favorable to the trial court's ruling, we hold that the finding was not clearly erroneous. Point of error four is overruled.

In his fifth point of error, appellant claims the trial court reversibly erred in conducting a portion of the trial in appellant's absence. The record of the voir dire examination in the instant case begins with the trial court informing the prospective jurors that they "have been summoned for a capital murder case." Following a general discussion of the voir dire process, the court proceeded with statutory exemptions, excusing two potential jurors. Appellant and his counsel entered the courtroom immediately thereafter, at which time the trial court reminded the potential jurors that this was a capital murder case, and introduced appellant and all of the attorneys. Appellant claims the trial court erred by conducting this portion of the voir dire in his absence, and claims he was harmed because "the veniremen were exempted from jury service for exemptions that did not track the standard legal exemptions and since the attorneys for both sides did not assent to the exemptions of the veniremen in the absence of Appellant," citing *Bath v. State,* 951 S.W.2d 11 (Tex.App.—Corpus Christi, pet. ref'd), *cert. denied,* 525 U.S. 829, 119 S.Ct. 80, 142 L.Ed.2d 62 (1998).

Generally, when prospective jurors are initially summoned, they are assembled in a general jury pool or general assembly. GEORGE E. DIX, ROBERT O. DAW-

SON, 43 Texas Practice § 35.13 (2001). Members of the general assembly are qualified on their ability to serve and exemptions and excuses are heard and ruled on by the judge presiding over the general assembly. Prospective jurors who are not disqualified, exempt, or excused are divided into trial panels and sent to the individual courts trying the cases. At that point, attorney voir dire will result in the jury that will ultimately hear the case. *Id.* The general assembly portion of jury selection is not considered part of "the trial" and therefore the accused is not entitled to be present. *Moore v. State,* 999 S.W.2d 385, 399 (Tex.Crim.App.1999), *cert. denied,* 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000); *Chambers v. State,* 903 S.W.2d 21, 31 (Tex.Crim.App.1995). We have stated that the general assembly is not part of a defendant's particular trial because "prospective jurors who are summoned to a general assembly have not been assigned to any particular case [and][t]he judge presiding over the general assembly is assigned for that purpose only at that time and has no given case in mind." *Chambers,* 903 S.W.2d at 31.

In the instant case, however, the trial judge assigned to preside over appellant's trial appears to have functioned as a general assembly judge over prospective jurors *already assigned to appellant's specific case.* Before addressing qualifications and excuses, the judge told the prospective jurors that they had been summoned for a capital murder case, although he did not introduce appellant until after ruling on the qualifications and excuses. We will therefore assume that appellant's trial had begun at the time of the exemptions, excuses and qualifications, and therefore we will assume that to be the case for purposes of addressing this point of error.

Article 33.03 requires, in all felony prosecutions, the personal presence of the defendant "at the trial" unless he voluntarily absents himself after pleading to the indictment or information or after the jury has been selected. Moreover, we have recognized that under the Sixth Amendment to the United States Constitution and Article I, § 10 of the Bill of Rights in the Constitution of Texas, "the scope of the right of confrontation is the absolute requirement that a criminal defendant who is threatened with loss of liberty be physically present at all phases of proceedings against him...." *Miller v. State,* 692 S.W.2d 88, 90 (Tex.Crim.App. 1985) (quoting *Baltierra v. State,* 586 S.W.2d 553 (Tex.Crim.App.1979)). Thus, it was statutory and constitutional error for the trial court to proceed with the excuses and qualifications in appellant's absence. The question is one of harm. Because we are faced with non-constitutional and constitutional error, we will apply the standard of harm for constitutional error. Tex.R.App. Proc. 44.2(a). In the case of constitutional error, we need not reverse appellant's conviction if we determine that the error was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Tex.R.App. Proc. 44.2(a). If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt. Appellant points to two prospective jurors who were excused, and argues he was harmed because they were not excused for "standard legal exemptions under Section 62.106 of the Texas Government Code."

A court is not restricted to excusing prospective jurors for enumerated exemptions only. Exemptions are distinguishable from excuses.[4] Article 35.03

---

4. Government Code section 62.106 lists *ex-* *emptions* from jury service. Exemptions are

provides that "the court shall hear and determine excuses offered for not serving as a juror, and if the court deems the excuse sufficient, the court shall discharge the juror or postpone the juror's service to a date specified by the court." We have repeatedly held that a trial court has broad discretion to excuse prospective jurors for good reason under article 35.03. *Wright v. State*, 28 S.W.3d 526, 533 (Tex.Crim.App. 2000) (citing Butler v. State, 830 S.W.2d 125 (Tex.Crim.App.1992)), *cert. denied*, 531 U.S. 1128, 121 S.Ct. 885, 148 L.Ed.2d 793 (2001); *Black v. State*, 26 S.W.3d 895, 899 (Tex.Crim.App.2000); *Fuentes v. State*, 991 S.W.2d 267, 277–78 (Tex.Crim.App.), *cert. denied*, 528 U.S. 1026, 120 S.Ct. 541, 145 L.Ed.2d 420 (1999); *see also* Tex. Gov't.Code § 62.110. The only statutory restriction on excuses is that an excuse cannot be given for "an economic reason" without the presence and approval of both parties. Tex. Gov't.Code § 62.110(c).

The first prospective juror was excused because the trial court determined she was a "caretaker."[5] The second prospective juror, who was pregnant, was excused upon explaining that she was within six weeks of her due date. Neither of these excuses was for an economic reason. Even if appellant had been present and objected to the excusals, the trial court would have been well within its discretion in overruling the objections. Thus, we are confident in concluding that appellant's ab-

sence at the time of these excuses was harmless beyond a reasonable doubt. Point of error five is overruled.

The judgment of the trial court is affirmed.

WOMACK and KEASLER, J.J., concur. HERVEY, J., not participating.

---

enumerated reasons a prospective juror is exempt from service as a matter of law. Excuses are not specifically enumerated, but are considered on a case by case basis within the broad discretion of the court. *Compare* Tex. Crim. Proc.Code art. 35.03 (excuses); Tex. Gov't.Code § 62.110 (excuses) *with* Tex.Crim. Proc.Code art. 35.04 (exemptions); Tex Gov't.Code § 62.106 (exemptions).

**5.** It is not completely clear from the record whether the caretaker was the prospective juror or whether the caretaker was appearing on behalf of the patient, who might have been

the prospective juror. Following is the brief exchange:

(Venireperson comes forward)
Venireperson: I'm a caretaker for him and he's starting surgery. He has to go for two weeks every day [sic]. *This is an excuse for him, doctor's excuse.*
(Emphasis added).
Court: What number are you?
Venireperson: 40.
Court: I'm excusing 40. She's a caretaker. Gloria Martinez is her name.