# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 26, 2012

No. 11-70001

Lyle W. Cayce
Clerk

RAY JASPER,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:08-CV-735

Before  DENNIS, CLEMENT, and ELROD, Circuit Judges.

PER CURIAM:[*]

Ray Jasper was convicted of a robbery-related murder and sentenced to death. He presses his appeal to this court on the single ground that the district court granted a certificate of appealability ("COA")—a potential *Batson* violation—while also requesting a COA on various issues that the district court

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-70001

rejected. We reject his *Batson* claim, deny the COA on the remaining issues, and AFFIRM the district court in all regards.

## FACTS AND PROCEEDINGS

Jasper was found guilty of robbery-related capital murder with a deadly weapon and sentenced to death. He planned and carried out the murder of an acquaintance and later confessed to his crime. The Texas Court of Criminal Appeals on direct review outlined the facts of the murder.

> David Alejandro owned and operated a music recording studio where musicians could have their music professionally recorded for a fee. This business required the use of various pieces of electronic equipment such as computers, soundboards and microphones. [Jasper] and some of his friends frequently recorded their rap music at the studio. At some point, [Jasper] decided to steal Alejandro's equipment in order to make money from its sale. Aware that Alejandro would be able to identify him, [Jasper] also decided to kill Alejandro so that there would be no witnesses. He enlisted the help of two friends to assist in removing the heavy equipment from the studio.
>
> On November 21, 1998, [Jasper] purchased large bags from an Academy store. A week later, he and his accomplices drove two vans to Alejandro's studio. [Jasper] and one accomplice carried concealed knives. The three had made an appointment at the studio and spent about two hours there while Alejandro recorded their music before they decided it was time to kill him. [Jasper] slashed Alejandro's throat from ear to ear, but did not kill him. [Jasper] and one accomplice continued to attack Alejandro until he died as a result of multiple stab wounds to his chest and abdomen. [Jasper] covered the body with a sheet taken earlier from [Jasper's] bed, and the group began loading equipment into the vans. [Jasper] fled on foot when an off-duty police officer arrived to investigate the scene, but was apprehended days later outside his home.
>
> On December 2, 1998, [Jasper] confessed to police that he had planned the crime and recruited two accomplices. His confession describes events in detail that were later corroborated by [Jasper's] girlfriend, Christina Breton, police officers, security guards, and physical evidence discovered by investigators. Breton testified that

2

No. 11-70001

> several days before the commission of the crime, [Jasper] had told
> her about his plan to steal Alejandro's equipment and kill him.

*Jasper v. State*, 61 S.W.3d 413, 417 (Tex. Crim. App. 2001).

On direct review, the Texas Court of Criminal Appeals affirmed his conviction and his sentence. *Id.* Jasper did not seek certiorari review from the U.S. Supreme Court. His application for state habeas corpus relief for ineffective assistance of counsel was denied. *Ex parte Jasper*, No. WR-68832-01, 2008 Tex. Crim. App. Unpub. LEXIS 536 (Aug. 20, 2008).

Jasper sought a COA in the district court for the Western District of Texas asserting fourteen grounds for relief. In a comprehensive 187-page opinion, the district court denied all but one claim. *Jasper v. Thaler*, 765 F. Supp. 2d 783 (W.D. Tex. 2011). The district court granted a COA on his *Batson* equal protection claim for allegedly race-based use of peremptory challenges during voir dire. Jasper presses his appeal on that front while also seeking a COA on various other grounds.

The sole issue on which Jasper was granted a COA was an alleged *Batson* violation. In *Batson*, the Supreme Court held that the use of a peremptory strike against a venire member on racial grounds violated the Equal Protection Clause. *Batson v. Kentucky,* 476 U.S. 79, 89 (1986). It also established a process by which defendants may contest the use of a purportedly racially motivated peremptory strike.

> [A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race . . . [T]he defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

3

. . .

Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. Though this requirement imposes a limitation in some cases on the full peremptory character of the historic challenge, we emphasize that the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. . . . The prosecutor therefore must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the defendant has established purposeful discrimination.

*Id.* at 96-98 (internal citations and quotation marks omitted). The Court has refined this process in subsequent cases. In *Purkett v. Elem*, the Court stated that an implausible or unbelievable justification for the strike must be found to be a pretext for purposeful discrimination. 514 U.S. 765, 768 (1995). The party alleging purposeful discrimination ultimately bears the burden of persuasion. *United States v. Webster*, 162 F.3d 308, 349 (5th Cir. 1998).

Jasper raises a *Batson* challenge to the peremptory strike of venire member Vernon Galloway. All members of the venire filled out a lengthy questionnaire prior to individual voir dire. Unfortunately, the questionnaires were not made part of the direct appellate record and have been lost for review. The transcript of the voir dire examination of Mr. Galloway is the only way to examine his answers to the questionnaire.

Galloway made numerous statements under questioning by the prosecutor.

- He said that he believed the death penalty was appropriate in some cases but that he could never return a verdict which assessed the death penalty. In response to a question by the prosecution on that answer he responded by saying, "Well, it's just that I can't play the role of God. I can't send nobody, you know, to death."

- In reference to the prosecutor saying that "you personally could not be involved as one of the twelve jurors who would ever answer those

questions in such a way as a man's life would be taken," Galloway answered, "I don't believe I can. But if I have to, I can make a decision."

- To follow up, the prosecutor asked: "If you were selected to sit as a juror in this case, could you answer those three punishment questions in such a way that you would know that the result of the way you answered those question that a man would be sentenced to death?" Galloway replied, "Yes."

- It was revealed that he had answered "Yes" and "too often" in reference to a question of whether the death penalty was ever misused. On follow up, he indicated that he thought innocent men had been executed and their innocence was not discovered until it was too late.

- According to the questionnaire, Galloway's greatest fear was that he would not have enough evidence to decide a case. Upon explanation by the prosecution of the burden of proof required in the trial, Galloway indicated that he would  have to personally ask questions to eliminate reasonable doubt in his mind if he felt there was not "enough evidence."

- Upon explanation by the prosecution that he would not be able to ask questions, he explained that he would ask them to the other jurors.

- He checked on his questionnaire that "capital [punishment] is absolutely never justified." On follow-up the prosecutor asked him "when it would *not* be too harsh?"(emphasis added). He responded "When you don't have enough evidence."

- He indicated on his questionnaire that he thought "capital punishment is the most hideous practice of our time."

- He stated that he strongly agreed that if someone is accused of capital murder, he should "have to prove his innocence." When the prosecutor explained that the burden was on the prosecution to prove guilt, he responded by saying, "I believe people have to prove it strongly." He then

went on to relate a story where an assaulter would have to prove, through the help of his lawyers, that he had not committed the crime

- He responded on the questionnaire that his friends describe him as "crazy." In voir dire, he indicated that he meant that he "joke[d] a lot."
- Finally, he indicated during voir dire that he could answer the three sentencing questions in such a way that he would know he was sentencing someone to death.

During the defense portion of the voir dire, Galloway was again told the appropriate burden of proof that applied to the case. He indicated that he could impose the death penalty if he felt there was enough evidence. At that point, defense counsel pointed out to Galloway that the defendant was black and that Galloway was the only black member of the panel. He then started to ask him if he would treat the defendant any differently. The prosecution objected and the court sustained the objection. During defense voir dire Galloway indicated that:

- he could assess capital punishment if given enough evidence;
- sometimes the criminal deserves capital punishment;
- we must have capital punishment for some crimes;
- capital punishment is wrong but it is necessary in an imperfect civilization;
- he had not understood the prosecution's question about his questionnaire answer agreeing with the statement "that capital punishment cannot be regarded as a sane method for dealing with crime";
- he had not understood the prosecution's question about whether the death penalty was never justified;
- he agreed with his questionnaire answer that "capital punishment may be wrong but it is the best preventative to crime";

After the prosecutor exercised his peremptory challenge and the judge had dismissed Galloway, Jasper's attorney belatedly raised a *Batson* challenge. The

district court told him that he was supposed to make the challenge before the venire member was dismissed, but nevertheless let him lodge his challenge. After arguing with the trial judge that the prosecution had struck all the black members of the venire, the defense lawyer was permitted to question the prosecution's decision to strike Galloway. The prosecutor cited a variety of race-neutral factors, including his:

- belief that Galloway's first impression of the death penalty was not positive, stating, "I believe Mr. Galloway believes that the death penalty is appropriate in some cases. [Although Galloway also stated,] 'But I can never return a verdict which addressed the death penalty.'";

- unease with Galloway's answer that the defendant would have had to have a prior run-in with the law before assessing the death penalty;

- unease with Galloway's answer that capital punishment is absolutely never justified;

- unease with Galloway's answer that capital punishment is the most hideous practice of our time;

- uncertainty whether Galloway trusted the criminal justice system in Bexar County, Texas;

- concern about Galloway's answer that his best friends describe him as crazy. The prosecutor stated, "It was somewhat tempered by his explanation, but it still left me feeling a little bit unsettled in terms of the decorum I would want to have on a jury in this case;"

- opinion that Galloway's gold-hoop earing was a little bit of "an outlier" for a fifty-two year old man, and that he was not interested in having jurors that are "outliers of the norm;"

- thought that Galloway might have been influenced by the inappropriate insinuation by the defense;

- dislike of Galloway's demeanor when he was asked by defense counsel about the death penalty being a sane method to deal with crime. The prosecutor explained that "there was something at that moment in his mannerisms that suggested to me that he still does not believe that it is a sane method of dealing with crime."

Upon questioning by the defense regarding Galloway's assertion that he was rushed in answering the questionnaire, the prosecutor responded that there was no one rushing him and the fact Galloway felt rushed also entered into his mind as a reason for striking him. After more discussion between the prosecutor and defense counsel about the questionnaire and why the prosecutor had asked Galloway about certain questions on the questionnaire and not others, the judge ruled against the *Batson* challenge stating that he believed the prosecutor had given racially-neutral reasons.

On direct appeal, the Court of Criminal Appeals rejected Jasper's equal protection claim and upheld his conviction and sentence. *Jasper*, 61 S.W.3d at 424. The court stated that "numerous written answers in the pre-voir dire questionnaire indicating a bias against the imposition of the death penalty can constitute a valid reason to exercise a peremptory challenge" and that "the record support[ed] the prosecutor's reasons for exercising a peremptory challenge against the venireperson in question." *Id.* at 422. When Jasper raised the equal protection claim in state habeas proceedings, the convicting court held it would not revisit the issue since it had been heard on appeal and thus could not form the basis for state habeas relief. The Court of Criminal Appeals accepted the convicting court's findings and denied relief. *Ex parte Jasper*, 2008 Tex. Crim. App. Unpub. LEXIS 536.

The district court for the Western District of Texas reviewed the state court's analysis and denied relief but granted a COA on the *Batson* issue for several reasons. *Jasper*, 765 F. Supp. 2d at 877. First, the state trial judge made

no express factual finding regarding the credibility of the prosecution's race neutral reasons for striking Galloway. *Id.* Second, there were no copies of the juror questionnaires available to the state appellate court or to the district court. *Id.* Third, Galloway's answers with regard to the death penalty differed so widely between his written statements and his oral voir dire that the district court felt this placed particular significance on the trial court's "favorable credibility determinations of the prosecution's race-neutral explanations." *Id.* Fourth, the prosecution accepted another venire member who had expressed reluctance about the death penalty. *Id.* Fifth, the district court wanted guidance on how to handle the lack of venire members' questionnaires and whether or not failure to preserve those questionnaires effectively waives a *Batson* claim. *Id.*

## DISCUSSION

### A. *BATSON* VIOLATION

Jasper's *Batson* claim is subject to review under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254(d). Under AEDPA, a federal court may not grant habeas relief for a defendant convicted of a state court judgment unless the constitutional adjudication by the state court a) "was contrary to federal law then clearly established in the holdings of [the Supreme Court];" b) "involved an unreasonable application of such law;" or c) "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (internal citations and quotation marks omitted). Under *Williams v. Taylor*, a "run-of-the-mill" state court decision applying the correct precedent to the facts of the case is reviewed for an "unreasonable application." 529 U.S. 362, 406-07 (2000). Federal habeas relief is only warranted where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002).

No. 11-70001

Even seemingly strong cases do not necessarily merit relief from the reviewing court because the state court's contrary conclusion may not have been unreasonable. *Richter*, 131 S. Ct. at 786. The Fifth Circuit has previously held that a federal court reviews only the state court's ultimate decision—not every link in the state court's reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *see also Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning or written opinion."). Finally, lower courts are not permitted to establish a new principle of constitutional law under AEDPA review. *See Williams*, 529 U.S. at 381.

*Appellant's Arguments*

Appellant's arguments focus on the supposed disparate treatment of Galloway compared to other, non-black jurors who gave similar answers on the questionnaire. As Jasper points out, the constitution forbids striking even a single prospective juror for a discriminatory purpose. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008); *Reed v. Quarterman*, 555 F.3d 364, 381 n.12 (5th Cir. 2009). Jasper argues that white jurors who gave similar answers on their questionnaires but changed those answers in oral voir dire were accepted by the prosecution and that Galloway was not.

As he did at the district court, Jasper suggests comparing the way other jurors were treated to see if Galloway's strike was racially motivated. *See Snyder*, 552 U.S. at 483. Jasper argues that we should compare Galloway to two different groups of people: the other black venire members, and to other, non-minority venire members.[1]

*Analysis of Hagans' answers compared with Galloway's*

---

[1] Contrary to Jasper's attorney's contention during voir dire with Galloway, there was in fact one other black venire member, Natasha Hagans.

No. 11-70001

On his first point of suggested comparison, Jasper's argument is weak. Jasper argues that Hagans was struck because she was black. Jasper's briefing on this point is exceedingly convoluted but he appears to make an illogical leap that even though Hagans gave different answers between the questionnaire and voir dire, striking her somehow shows racial bias in the dismissal of Galloway, the other black member of the venire. He contends that the Prosecutor's further questioning of Galloway and Hagans regarding the different answers they gave on their questionnaires compared to their voir dire answers, somehow shows bias towards Galloway because of his race. He states "[b]ut when Mr. Galloway testified opposite to his questionnaire, the prosecutor didn't accept those [voir dire] answers as valid."

This muddled reasoning aside, any comparison to Hagans is especially unpersuasive when reviewing some of the answers that Hagans gave during voir dire.

> Ms. Hagans testified during her voir dire, in pertinent part: (1) she had a number of teenage friends (four or five) who had been murdered when she lived in Virginia and she felt the police in Virginia had failed to properly investigate those crimes and bring the perpetrators to justice, (2) in her experience, police officers were intimidating, (3) she had a younger brother who was in jail for violating parole and writing bad checks, (4) her daughter's father sold crack and marijuana while they were together and had served time in jail for his drug dealing but resumed drug dealing once he got out of jail, and (5) she believed a person who committed murder should get life in prison. At that point, the prosecution exercised a peremptory challenge and petitioner's defense counsel raised a *Batson* objection.

*Jasper*, 765 F. Supp. 2d at 816. During the *Batson* challenge regarding Hagans, the prosecutor cited her hostility toward police officers, who she described as "intimidators", her romantic relationship with a crack dealer, her belief that her brother should receive a second chance despite his long criminal record, and her

11

oral testimony that she believed convicted murderers should receive life in prison. *Id.* at 817. The judge then overruled the *Batson* challenge and removed her from the venire.

The comparison between Galloway and Hagans is of little use. Hagans gave multiple answers which could cause a prosecutor to hesitate to have her on any jury, and her anti-death penalty answers were similar to Galloway's thus supporting the prosecution's argument that Galloway was dismissed for race-neutral reasons.

*Analysis of prosecutor's questioning of non-black members compared to Galloway*

Jasper's second point of comparison under the *Snyder* standard is a comparison between Galloway and other, non-black, venire members. He cites multiple instances in which non-black members of the venire gave similar answers on the questionnaire or during oral testimony, including expressing opposition to the death penalty. According to Jasper, these answers did not disqualify them from serving, but did disqualify Galloway, demonstrating racial motives behind the peremptory strike.

The district court analyzed the voir dire exchanges in detail and found that, contrary to Jasper's argument, none of the other potential jurors came close to giving a pattern of answers similar to Galloway's. *See id.* at 817; *see also Snyder,* 552 U.S. at 483 ("[A] retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In this situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of the trial might have shown that jurors in question were not really comparable."). It is not surprising that some individual answers were similar or identical to Galloway's because of the length of the questionnaires and the number of questions involved. As the district court explained:

No. 11-70001

> This Court's independent review of the voir dire of all the venire members reveals no instances in which Black venire members were questioned in a manner dramatically different from the questioning of venire members of other ethnic groups. Unlike the situation in *Miller-El*, there does not appear to have been a blatant use of graphic voir dire questions about the process of carrying out an execution in Texas at the commencement of voir dire for Black venire members. Nor did this Court identify anything else that was different about the way the prosecution chose to conduct voir dire of Black venire members, as opposed to non-Black venire members. The state trial court could reasonably have concluded there was nothing about the prosecution's questioning of the jury venire as a whole which supported a finding the strike of Mr. Galloway was racially motivated.

*Jasper*, 765 F. Supp. 2d at 819. The district court went on to explain: "The prosecution appeared to question every member of the jury venire who gave any questionable answers on their juror questionnaires regarding their views on the efficacy of the death penalty in a similar, open-ended manner." *Id.* at 821. We agree with the district court's conclusions. Further, Jasper fails to demonstrate that any other juror expressed as many reservations about the death penalty as Galloway did on his questionnaire.

## Conclusions Regarding the Batson Challenge of Galloway

Jasper's claim that Galloway was removed for racial reasons in violation of the Fourteenth Amendment is unpersuasive. Although he established a prima facie case, the failure to preserve the questionnaires in the record makes the comparative analysis he seeks difficult to conduct. Jasper has the burden of proving that the discrimination was purposeful. *See Woodward v. Epps*, 580 F.3d 318, 338 (5th Cir. 2009) (noting that petitioner must carry burden of proving purposeful discrimination but declining to find waiver of comparative analysis). The record does not indicate why the questionnaires were not included in the trial court record, but that does not negate the fact that the burden is on the

plaintiff to demonstrate that the prior findings were erroneous. There is nothing which would indicate that Jasper has met this burden, especially in light of AEDPA's demanding standards. The trial court determined that there were non-racial reasons for the peremptory strike and Jasper did not satisfy his burden of overturning this conclusion. There is no indication that the trial court's analysis was an unreasonable application of law. "[O]n appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Snyder,* 552 U.S. at 477. Galloway gave a variety of answers that would trouble a prosecutor in a capital murder trial and potentially presented himself with a demeanor that would make a prosecutor credibly question his seriousness for the task. As such, we affirm the ruling below.

## B. COA ON OTHER POINTS OF ERROR

Jasper asks for a COA for numerous alleged errors, all of which were previously denied by the district court, including: 1) ineffective assistance of counsel for failure to raise his immaturity during sentencing; 2) ineffective assistance of counsel for allowing him to testify without prior knowledge of his testimony; 3) denial of due process by the trial court for failing to investigate a supposed disagreement between Jasper and his attorneys; 4) insufficient evidence was presented to demonstrate that Jasper would be a continuing threat to society if given a life sentence; 5) whether trial counsel was ineffective for failing to provide a vehicle for mitigating evidence; 6) violation of due process for failing to conduct a proportionality review in a death penalty case; 7) that Texas' Capital Sentencing statute is unconstitutional because it does not inform jurors that a single juror can hold out; 8) that the Texas Capital Sentencing structure is unconstitutional because it gives jurors "open-ended discretion;" 9) that, as applied, the mitigating evidence special issue is unconstitutional, under *Apprendi,* because the state does not have to prove it beyond a reasonable doubt.

No. 11-70001

Under AEDPA, before a petitioner may appeal the denial of a federal habeas corpus claim, he must obtain a COA. "[U]ntil a COA has been issued federal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citing § 2253(c)(1)). To grant a COA, the court of appeals must be satisfied that the petitioner has made a "substantial showing of the denial of a constitutional right." *Id.* A petitioner must "sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Id.* (alteration in original) (internal quotation marks omitted). "A prisoner seeking a COA must prove something more than the absence of frivolity or the existence of mere 'good faith' on his or her part." *Id.* at 338 (internal quotation marks omitted). The question for the court of appeals looking at a COA application is "the debatability of the underlying constitutional claim, not the resolution of that debate." *Id.* at 342. Jasper has not made the necessary showing to merit a COA on any of the issues he raises.

### *Jasper's age and immaturity*

Jasper cites the recent Supreme Court decision in *Roper v. Simmons* which prohibited the death penalty for minors. 543 U.S. 551 (2005). Jasper claims that his attorney failed to argue his age and immaturity as mitigating factors. Even though Jasper was over eighteen at the time of the murder, he cites to the proposition in *Roper* that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Id*. at 574. Jasper fails to explain his supposed immaturity and simply argues that he is more mature now than he was at the time of the crime. Conclusory statements aside, Jasper presents no evidence that was immature enough to fall within *Roper*'s dicta.

The problem with this argument is three-fold. First, Jasper was over the age of eighteen at the time he committed the murder so *Roper* is inapplicable on its face. Second, Jasper is arguing that his counsel was ineffective for not presenting evidence of his immaturity, but the record indicates that his lawyers did in fact present such evidence, including testimony from his father about his age and evidence from a psychiatrist that he was relatively immature. Third, a *Strickland* ineffective assistance claim under AEDPA is an exceedingly high bar because Jasper must show that his counsel was objectively unreasonable, that the unreasonableness prejudiced him, and still pass AEDPA's requirements. If there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard, the claim must be dismissed. *See Harrington,* 131 S. Ct. at 788. Jasper has not satisfied this standard.

*Testifying at trial with inadequate preparation by attorney*

He contends that his trial counsel's failure to prepare him to testify is evidence of ineffective assistance of counsel. Jasper testimony included denying his part in the actual death of the victim and testifying about thoughts of pulling the court bailiff's gun while on the stand. The district court dealt with this issue extensively. *See Jasper*, 765 F. Supp. 2d at 857-63, and there is no indication that it reached the wrong conclusion.

This argument is unavailing. The record indicates that his trial counsel advised him of his right to testify and that there could be pitfalls in testifying. Further, trial counsel stated that Jasper insisted on testifying despite his advice. Counsel also had no knowledge that Jasper was going to testify as he did. *See United States v. Fields*, 565 F.3d 290, 295 (5th Cir. 2009) ("Clairvoyance is not a required attribute of effective representation."). Jasper gives no reason to believe that his representation was objectively unreasonable. As such, we deny his application for a COA.

*Trial court's failure to inquire about the conflict between Jasper and his lawyer*

He also alleges that the trial court violated his due process rights by failing to inquire into an alleged conflict between him and his attorneys. He failed to raise this point on direct appeal or during his state collateral attack and therefore the claim is procedurally defaulted. Before seeking federal habeas corpus relief, a state prisoner must exhaust available state remedies, thereby giving the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004). Under AEDPA, federal courts, absent special circumstances, lack the power to grant habeas relief on claims that have not been exhausted. *See Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003); *Orman v Cain,* 228 F.3d 616, 619 (5th Cir. 2000). Having failed to raise this point at the state level, Jasper's claim must be dismissed.

Despite this fact, the district court sufficiently addressed this claim on the merits:

> [T]here is no merit to petitioner's fourth claim. A criminal defendant's generalized statement of dissatisfaction with the performance of his trial counsel does not, standing alone, necessitate intervention by a trial court to inquire into the reasons for that dissatisfaction. Moreover, under the facts of petitioner's case, it was evident to the state trial court why petitioner was expressing impatience and even hostility toward his own trial counsel—said trial counsel were attempting to help petitioner obtain a life sentence despite petitioner's refusal to accept any responsibility for David Alejandro's murder.

*Jasper*, 765 F. Supp. 2d at 85 (citations omitted). We agree with the district court's conclusion that even if the claim had not been procedurally defaulted, it would not warrant the issuance of a COA and deny his request for a COA on this issue.

*Insufficient evidence of future dangerousness*

No. 11-70001

Jasper seeks a COA on the claim that there was insufficient evidence of future dangerousness presented to the jury. This claim was presented on direct appeal and in state habeas proceedings, as well as in the district court. It is wholly without merit. The conclusions of the Texas Court of Criminal Appeals dispel this claim best:

> The facts of this crime were brutal and demonstrated calculated deliberation. Appellant planned well in advance the stabbing murder of someone he would later describe as "one of the nicest people [he] ever met in [his] life." He allowed Alejandro to assist him with recording for two hours, knowing he was about to kill him. As Alejandro sat unaware at the soundboard mixing a track for appellant, appellant pulled his head back and, taking a kitchen knife from his jacket, slit his throat from ear to ear. When that wound did not kill him, one of appellant's accomplices joined the attack until Alejandro was dead. Alejandro suffered twenty-five stab wounds. Appellant quickly loaded equipment into the vans and instructed one stunned accomplice to hurry up and help.
>
> In addition to the facts of the crime itself, evidence adduced at trial of prior criminal history and lack of remorse support the jury's finding. Appellant's criminal history included incidents beginning at the age of fifteen, when he stole a bicycle. He was expelled from school for possession of marijuana and expelled from alternative school. More recently, he attempted a residential burglary and attacked the off-duty police officer who attempted to detain him and also attempted to evade police at a traffic stop, leading them on a high-speed chase. The evidence introduced by the State at trial shows a pattern of escalating criminal activity and an increasing proclivity to break laws posing threats to the safety of others. Furthermore, the evidence showed a lack of remorse. Immediately after killing Alejandro, appellant began loading the vans. At the punishment phase of the trial, when asked if he had anything to say to Alejandro's family, appellant replied that he wanted the family to know that he did not kill Alejandro because, according to the autopsy, the only wound he claims to have been inflicted by his hand (slicing the victim's throat, as opposed to the twenty-five stab wounds), was not enough to kill him.

18

> Based on the facts of the offense and other evidence of escalating criminal activity and lack of remorse, a rational jury could have found beyond a reasonable doubt that appellant would continue to be a threat to society. Accordingly, we hold the evidence legally sufficient to support the jury's affirmative answer to the future dangerousness special issue.

*Jasper*, 61 S.W.3d at 418. We deny him a COA on this issue.

### *Ineffective assistance of counsel for failing to explain the mitigating evidence*

He seeks a COA on the claim that his trial counsel should have objected to the punishment phase jury charge or requested supplemental instructions informing the jury that it could give mitigating effect to petitioner's evidence. He argues that counsel's failure to do so amounted to ineffective assistance. There is no indication that the jury instruction was defective, and Jasper does not even attempt to explain what a proposed jury instruction would have included. Any such objection at the trial level would have been deemed meritless. As such, the failure of Jasper's trial counsel to object does not meet the high threshold of *Strickland*. *See Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009) (failure to raise a meritless objection does not satisfy the deficient performance prong of *Strickland*). Therefore the state's rejection of this claim during Jasper's state habeas corpus proceeding was neither contrary to existing law nor an unreasonable application of that law, and does not rise to the level necessary for the issuance of a COA.

### *Structural problems with the Texas death penalty scheme*

Finally, Jasper argues that there are numerous constitutional defects with the Texas sentencing scheme, all of which have previously been rejected by the Supreme Court or this court. Each one of these claims was extensively discussed by the district court and dismissed. The district court's summary of these challenges (after comprehensive analysis of each point) states:

> Petitioner's constitutional challenges to the Texas capital sentencing scheme present claims this Court and the Fifth Circuit have consistently rejected for more than half a decade. Petitioner made no effort to distinguish the rulings by this Court or the many opinions by the Fifth Circuit Court of Appeals rejecting those constitutional complaints on the merits. . . .This Court has also rejected those same claims as bases for a CoA. *See, e.g., Bartee v. Quarterman*, 574 F. Supp. 2d at 712-14 (denying CoA on many of the same claims asserted by petitioner in his eighth through fourteenth claims herein); *Moore v. Quarterman*, 526 F. Supp. 2d at 740 (denying CoA on many of the same constitutional challenges to the Texas capital sentencing scheme raised by petitioner herein). Petitioner is not entitled to a CoA on any of his [Texas death penalty scheme] claims.

*Jasper*, 765 F. Supp. 2d at 875.

According to Jasper, the Texas scheme: a) fails due process because it does not include a proportionality review (rejected in *Martinez v. Johnson,* 255 F.3d 229, 241 n.17 (2001)); b) fails to inform the jury that a holdout will lead to a life sentence (rejected in *Jones v. United States*, 527 U.S. 373, 384 (1999)); c) gives the jurors open ended discretion (rejected in *Sonnier v. Quarterman*, 476 F.3d 349, 367 (5th Cir. 2007)); and d) violates *Apprendi*[2] and its progeny because it places an unconstitutional burden on the defendant for mitigating evidence (rejected in *Ortiz v. Quarterman*, 504 F.3d 492, 504-05 (2007)). Jasper gives no new reasons to accept his claims on these grounds nor does he distinguish his case from previously rejected challenges to the Texas death penalty scheme. As such his request for a COA on these grounds is denied.

Conclusion on denial of a COA

Jasper presents no arguments to refute the diligent and comprehensive analysis by the district court on all these issues. The district court meticulously analyzed each one of these claims and properly concluded that there was no

---

[2] *Apprendi v. New Jersey,* 550 U.S. 466 (2000).

No. 11-70001

reason to issue a COA on any of his claims alleging ineffective assistance of counsel, due process violations, or the unconstitutionality of the Texas death penalty scheme. We agree.

## CONCLUSION

We AFFIRM the ruling of the district court on the *Batson* violation claim, and deny a COA on all other claims.