**Opinion filed February 26, 2021**



# In The

# Eleventh Court of Appeals

_____

## No. 11-18-00324-CR

_____

## JUAN RAMON BARRON, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 132nd District Court**

**Scurry County, Texas**

**Trial Court Cause No. 10592**

## O P I N I O N

The grand jury indicted Appellant, Juan Ramon Barron, for the murders of Joshua Hoover and Benjamin Bruns. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2019). After a contentious trial, the jury acquitted Appellant of Bruns's murder. However, the jury implicitly rejected Appellant's claim of self-defense and found him guilty of the murder of Hoover. The same jury found that Appellant caused Hoover's death while under the immediate influence of sudden passion that

arose from adequate cause and assessed his punishment at two years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice. *See id.* § 19.02(d). The trial court sentenced Appellant accordingly.[1]

Appellant raises six issues on appeal. He contends that (1) the trial court erred when it admonished Appellant's trial counsel in the presence of the jury; (2) the trial court erred when it admitted evidence that was located nine months after the murders because it lacked relevancy; (3) the trial court erred when it admitted the same evidence because it was unfairly prejudicial; (4) the evidence was insufficient to support the jury's rejection of his claim of self-defense; (5) the trial court erred when it refused to admit Appellant's proffered evidence of prior bad acts of violence allegedly committed by the deceased victim (Hoover) against others to show motive; and (6) the trial court erred when it refused to admit proffered evidence of prior bad acts of violence allegedly committed by the deceased victim (Hoover) against others to show that Hoover was the first aggressor. We affirm.

I. *Factual and Procedural Background*

A. *Evidence at Trial*

The murders of Bruns and Hoover arose from their encounter with Appellant on January 24, 2016, at approximately 4:00 a.m. at Appellant's trailer. Later, Appellant and his wife, Nicole, provided law enforcement personnel with detailed versions of what they claimed had occurred during the encounter. The substance of their written statements and recorded interviews were presented to the jury. Neither Appellant nor Nicole testified at trial.

---

[1]We note that Appellant's wife, Jamai Nicole Barron, was also indicted for the murders of Bruns and Hoover, that Appellant and Nicole were tried together in a consolidated trial, and that the jury acquitted Nicole of both murders. We note also that Appellant and Nicole were both subsequently convicted by a different jury of the offense of tampering with physical evidence, a human corpse, and that the appeals of those convictions are pending before this court in Cause Nos. 11-19-00125-CR and 11-19-00128-CR.

According to Appellant and Nicole, Amanda Smith, a friend, was with them in their trailer at the time of this encounter. They were watching movies, drinking, and using drugs—marihuana and cocaine. At approximately 4:00 a.m., they heard someone knock on the back door. As Appellant approached the back door, he held a knife in his hand because it was late and they were not expecting anyone. When Appellant answered the door, he saw two men who were dressed in black clothing; they were also wearing ski masks. Appellant said, "You ain't going to rob me." He then rushed down the steps of the trailer toward the two men. Appellant stated that Nicole was behind him, armed with two knives, and that one of the men struck her in the face with a gun.

Appellant began fighting with the man, later identified as Benjamin Bruns, who struck Nicole. According to Appellant, he stabbed Bruns repeatedly because Bruns would not drop his gun. Appellant stated that Bruns eventually "popped one round off" and then dropped the gun. Appellant heard Nicole screaming for him from around the corner of the trailer. He then grabbed the gun that Bruns had dropped and ran toward Nicole, who was fighting with the other man, later identified as Joshua Hoover. Appellant stated that Hoover was on the ground trying to pull Nicole to the ground. Appellant shot Hoover several times—he estimated four or five—until he "knew [Hoover] was dead." Appellant claimed to be approximately eight to twelve feet from Hoover when he discharged the gun.

Nicole's statement to law enforcement was essentially consistent with the statement that Appellant made during his interview, although certain details differed. In her statement to law enforcement personnel, Nicole said that, after she heard Appellant say something to the effect of "oh hell no, you're not going to rob me," she jumped up from the couch, retrieved two kitchen knives, and yelled at Smith to grab Nicole's daughter—who was asleep in her room—and to leave their trailer. Smith did so. Nicole stated that, when she went outside, Appellant was already

3

fighting one of the men (Bruns). The other man (Hoover) then appeared from around the side of the trailer and attacked her. Nicole heard a gunshot and began calling for Appellant because she thought he had been shot. Suddenly, Hoover punched Nicole in the face. Nicole noticed that Hoover had something in his hand; Appellant then shot Hoover. Although Nicole believed that Hoover was brandishing a gun, after Appellant shot Hoover, she saw that the object in Hoover's hand was a can of mace.

Bruns and Hoover both died from the wounds that Appellant inflicted upon them. Appellant and Nicole stated that they did not recognize either man, even after their masks were removed. Appellant and Nicole both stated that they were drunk and high and that they had panicked.

After Appellant and Nicole moved the bodies of Bruns and Hoover to a spot underneath the trailer, they attempted to clean up the crime scene. They dug up the dirt where Bruns's blood and Hoover's blood had accumulated, and they used a water hose to saturate those areas with water. They concealed all the "bloody stuff," including the knife used by Appellant. They also concealed their bloody clothing, wrapped everything in blankets, and stored it all behind a nearby shed. Appellant and Nicole also put two mason jars of marihuana behind the shed. Appellant stated that the marihuana belonged to Nicole, who was a dealer, and that he did not believe that either Bruns or Hoover had come to their trailer to purchase "weed." Appellant routinely worked sixteen- or seventeen-hour days, returned home, smoked some marihuana or used cocaine, and then went to bed. According to Appellant, he did not know why either Bruns or Hoover would want to rob him.

Eventually, after cleaning and tampering with the crime scene, Appellant and Nicole decided to surrender to the police. As they left their trailer, Nicole noticed an unfamiliar car parked near their trailer, by the mailboxes; the engine was running.

Upon their arrival at the Snyder Police Department, Appellant and Nicole reported that they had killed two people who were trying to rob them. The officers

4

on patrol were notified of this incident and were dispatched to the crime scene. Officer Nikki Gonzalez was nearby responding to an earlier report of a suspicious vehicle in the area of Appellant's trailer. Before she went to the crime scene, Officer Gonzalez investigated the presence of a maroon Crown Victoria with its engine running that was parked by the mailboxes near Appellant's trailer. After she arrived at the crime scene, Officer Gonzalez inspected the area around Appellant's trailer and eventually discovered two bodies hidden underneath the trailer.

Snyder Police Detective Mike Counts and Texas Ranger Phil Vandygriff were in charge of the investigation. Ranger Vandygriff supervised the removal of two bodies from under Appellant's trailer. The bodies were later identified as Hoover and Bruns. A large knife with a white handle, a bent blade, and a broken tip was recovered from the crime scene, and a shell casing was located near Appellant's trailer. Officers at the crime scene observed a water hose stretched across Appellant's yard; they also discovered several wet and muddy spots in the yard. Bloody clothing and two mason jars that contained marihuana were also collected from behind a shed in Appellant's yard.

Inside Appellant's trailer, a gun, a can of mace, and five shell casings were found on the kitchen table inside a pizza box. The gun had one bullet in the chamber and one bullet remaining in the magazine. Although officers at the crime scene observed blood smears and stains inside the trailer, Sergeant Lea Tarter of the Snyder Police Department testified that the stains appeared to be from transfers and that she did not believe that a wounded body or a person who was bleeding had been in the trailer. During the search of the trailer, officers also seized two bloody knives and trash bags containing bloody clothing.

Appellant stated in his first interview with law enforcement that he did not recognize either Bruns or Hoover. However, during subsequent interviews, Appellant stated that he had heard that someone named Hoover sold cocaine and had

robbed two other people in the area. Nicole advised law enforcement that she sold drugs, that she had sold drugs to Hoover in the past, and that she had seen him at parties. Nevertheless, both Appellant and Nicole stated that they did not know Bruns. Nicole also told law enforcement that the only reason she could determine as to why Hoover and Bruns would appear at her trailer in disguise would be to rob her and take her two mason jars of "really good weed."

Smith was with Appellant and Nicole that night. Smith testified that the three of them were drinking, smoking marihuana, using cocaine, and watching movies. She stated that Appellant and Nicole heard something at the back door around 4:00 a.m. Appellant then walked to the back door of the trailer. Suddenly, a man wearing black clothing and a black mask burst through the front door of the trailer. The man then walked out the back door of the trailer. Smith saw that Appellant was rolling around on the ground with someone and that Nicole was fighting someone else. Nicole eventually yelled at Smith to get Nicole's daughter and leave. Smith complied. According to Smith, Nicole called later to ask if her daughter was okay. Smith asked Nicole if she and Appellant were alright. Nicole replied, "No, but we will be." Smith assumed that this meant that Appellant and Nicole had called the police.

Dr. Thomas Parsons performed the autopsies on the bodies of Hoover and Bruns. He determined Bruns's cause of death to be from a single gunshot wound to his head from an undetermined distance. Dr. Parsons concluded that Hoover's death was caused by multiple gunshot wounds to his chest and head. Dr. Parsons testified that there was a single entry wound for the two bullets that were removed from Hoover's head. Dr. Parsons concluded that these two shots were fired from a range of only a few inches to as much as thirty-six inches in distance from Hoover's body. The ski masks worn by Hoover and Bruns were placed on Styrofoam balls to simulate how the masks were worn by them. According to Detective Counts, the

6

defects and holes in the masks were consistent with the head wounds inflicted upon Hoover and Bruns. Although Bruns's autopsy revealed that, in addition to his stab wounds, he also had a head wound from the entry of a single bullet, Appellant maintained that he only stabbed Bruns and that he did not shoot him. Appellant claimed that he only shot Hoover.

During their search of the crime scene, officers located a hole in the side of Appellant's trailer near the area where Appellant said Bruns had "popped one round off"; a bullet lodged in the stove inside the trailer was also discovered. Additional bullets were found in the ground in the location where Appellant had shot Hoover. Utilizing trajectory rods, Ranger Vandygriff testified that he was able to determine the path of the bullet that Bruns had "popped off"; the trajectory of that bullet was consistent with Appellant's statement to law enforcement.

At trial, Appellant presented the testimony of Tim Tipton, a thirty-year veteran of the Oklahoma Highway Patrol. Over the years, Tipton had studied the methods used to evaluate the body's reactions to high stress life-and-death situations and had also trained other officers in this discipline. Based on his experience and training, he testified that, when a person is in a high-stress situation, it would be common for that person to express inconsistencies "in what the physical evidence shows versus how somebody recalls it." However, Tipton further testified that it would not be unusual for a person to inaccurately recall the number of gunshots they heard or the order in which events actually occurred. Tipton examined the evidence in this case, determined that Appellant and Nicole had experienced a highly stressful event, and suggested that the high level of stress could have affected their ability to accurately recall and to provide precise details of what actually did occur at their trailer that morning.

Officers at the crime scene determined that the maroon Crown Victoria that was parked with the engine running near Appellant's trailer belonged to Jesus

Garcia. The gun and the mace retrieved from the crime scene belonged to Josh Zabala. Hoover, Bruns, Garcia, and Zabala had been together at the house where Zabala lived on the night in question. They were hanging out and drinking whiskey. At some point, Zabala went to bed. Zabala testified that he did not give either Hoover or Bruns permission to take his gun. After Zabala was asleep, Hoover and Bruns borrowed Garcia's car to go buy cigarettes. Garcia testified that neither man was wearing black clothing or a ski mask when they left Zabala's home.

Eight months after the murders, workers from a trucking company that was located next to Appellant's trailer discovered a safe in the trucking company's yard. Law enforcement personnel took the safe but were unable to determine its rightful owner. The safe was later opened by law enforcement officers. Among other things, the safe contained a wallet that included Nicole's identification, a jar of marihuana, some baggies of cocaine, and drug paraphernalia (scales).

*B. Evidentiary Rulings*

Appellant, through his trial counsel, challenged certain evidentiary rulings made by the trial court. Appellant's trial counsel objected to the admission of the items discovered in the safe, namely the drugs, the drug paraphernalia, and the wallet containing Nicole's identification, on the bases that the evidence was not relevant and that its admission would be unfairly prejudicial to Appellant. The trial court overruled Appellant's objections and admitted the evidence. However, the trial court did instruct the jury that any extraneous evidence was to be considered only for "intent, knowledge, motive, state of mind[,] or the application of the laws related to self-defense."

Appellant's trial counsel sought to admit the testimony of two witnesses—Kaden McCarter and Ruth Ann Kerry—to show that Hoover had, on previous separate occasions, committed the offense of aggravated robbery against each of them. Appellant contended that this evidence was relevant to show motive and

8

would also show that Hoover was the "first aggressor." Although Appellant raised a claim of self-defense, the trial court denied the admission of either witness's testimony. The trial court concluded that, under Rules 403 and 404 of the Texas Rules of Evidence, both instances were offered by Appellant for the impermissible purpose of showing conformity with character and that, if admitted, the prejudicial effect of this evidence would substantially outweigh any probative value.

*C. The Jury Charge*

The jury charge included instructions for self-defense, defense of third persons, and defense of property. Appellant does not challenge the propriety of these instructions. In response to the questions submitted in the guilt/innocence charge, the jury acquitted Appellant of the murder of Bruns, but convicted him of the murder of Hoover.

The offense of murder is typically a first-degree felony. PENAL § 19.02(c). However, at the punishment phase of a trial, a defendant convicted of murder may claim that he caused the death of an individual while under the immediate influence of sudden passion arising from an adequate cause. *Id.* § 19.02(d). If the defendant proves the issue of "sudden passion" in the affirmative by a preponderance of the evidence, the punishment for the charged offense is reduced to a second-degree felony range. *Id.*; *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). Here, the punishment charge included a "sudden passion" instruction. As we have said earlier, the jury affirmatively found that Appellant acted under the influence of "sudden passion" and assessed the minimum sentence of two years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice. *See* PENAL § 19.02(a)(2), (d). The trial court sentenced Appellant accordingly. This appeal followed.

9

## II. *Analysis*

### A. Sufficiency of the Evidence – Self-Defense

We first address Appellant's fourth issue, whereby he challenges the sufficiency of the evidence to support the jury's rejection of his claim of self-defense. A finding in his favor would result in an acquittal. We review a challenge to the sufficiency of the evidence, regardless of whether it is framed as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Similarly, when a defendant challenges the sufficiency of the evidence to support the rejection of a defense raised by him, such as self-defense, we examine all of the evidence in the light most favorable to the verdict to determine whether a rational jury could have found the defendant guilty of all essential elements of the charged offense beyond a reasonable doubt and also could have found against the defendant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *see also Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018) (reaffirming *Saxton*).

To support a claim of self-defense, the defendant bears the burden to produce some evidence to support the claim; the State bears the burden of persuasion to disprove the raised defense. *Braughton*, 569 S.W.3d at 608 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton*, 804 S.W.2d at 913–14). Once the defendant produces that evidence, the State's burden does not require the

production of additional evidence to disprove the defense; instead, it requires only that the State prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594–95.

When a defendant raises a justification defense, such as self-defense, a determination of guilt by the jury is an implicit rejection of the defensive theory. *Zuliani*, 97 S.W.3d at 594–95; *Saxton*, 804 S.W.2d at 914. As such, because a claim of self-defense is a fact issue to be determined by the jury, the jury is free to accept or reject the defensive theory, either version of the facts, and any part of a witness's testimony. *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *see Saxton*, 804 S.W.2d at 912 n.3.

Viewing the evidence in the light most favorable to the verdict requires that we consider all of the evidence admitted at trial, including improperly admitted evidence. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. The *Jackson* standard is deferential and accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 732; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, when the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

It is undisputed that Appellant killed Hoover. Under the Penal Code, a person commits the offense of murder if he intentionally or knowingly causes the death of an individual. PENAL § 19.02(b)(1). Here, the jury determined that Appellant committed the offense of murder under this provision of the Penal Code, and there is sufficient evidence in the record for the jury to have found the essential elements of murder beyond a reasonable doubt. However, under appropriate circumstances, a defendant may raise the claim of self-defense to justify his use of deadly force. As such, deadly force used in self-defense is a defense to a prosecution for murder if that use of force is "justified." *Braughton*, 569 S.W.3d at 606.

In asserting self-defense, the use of force is justified "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." PENAL § 9.31(a). In the same manner, the use of deadly force against another is justified under the above circumstances "if the actor would be justified in using force against the other" under Section 9.31 and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force" or "to prevent the other's imminent commission of . . . robbery[] or aggravated robbery." *Id.* § 9.32(a). "'Deadly force' means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3). A reasonable belief is a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. *Id.* § 1.07(a)(42) (West Supp 2020). Under certain conditions, an actor's belief that deadly force was immediately necessary is presumed to be reasonable. *Id.* § 9.32(b). One condition of the presumption of reasonableness is that the actor was "not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used." *Id.* § 9.32(b)(3).

Appellant contends that the evidence was insufficient for a rational trier of fact to find against him on his claim of self-defense. Essentially, he asserts that the jury was required to accept his claim of self-defense because there was some evidence to support it and because no evidence was offered by the State to show that he did not act reasonably under the circumstances. We disagree. The evidence to support Appellant's claim that he was acting in self-defense was derived primarily from his own statements. As such, Appellant's theory of self-defense was inherently a credibility determination for the jury to resolve. Because the credibility of Appellant's claim of self-defense was solely within the jury's province to determine, the jurors were free to reject it. *See Saxton*, 804 S.W.2d at 914; *see also Braughton*, 569 S.W.3d at 611–13.

Additionally, there is ample evidence that supports the jury's rejection of Appellant's claim of self-defense. It is undisputed that Bruns and Hoover approached Appellant's trailer at approximately 4:00 a.m. wearing ski masks and all black clothing. Appellant shot Hoover, who had attacked Nicole, until he was certain that Hoover "was dead." Dr. Parsons testified that Hoover's gunshot wounds were inflicted from a distance of no greater than thirty-six inches, rather than Appellant's estimated distance of eight to twelve feet. Although Appellant's statements were somewhat consistent with the forensic and other evidence collected and analyzed by law enforcement, the jury was not required to accept Appellant's claim and version of events as true simply because some evidence supported it. *See Braughton*, 569 S.W.3d at 609; *Saxton*, 804 S.W.2d at 914. Rather, the jury was free to judge the credibility and weight of all of the evidence presented. *See Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

Furthermore, the evidence supports the jury's rejection of Appellant's claim that his actions were reasonable under the circumstances. *See Winfrey*, 393 S.W.3d at 767; *Clayton*, 235 S.W.3d at 778. Appellant stated that he and Nicole possessed

13

illegal drugs at the time of the incident, which rebuts the presumption of reasonableness. *See* PENAL § 9.32(b)(3). Appellant's and Nicole's statements were inconsistent on critical facts. In Dr. Parsons's testimony, he addressed the discrepancy in the distance between Appellant and Hoover when Appellant shot Hoover. Dr. Parsons also addressed the significance of Hoover's single-entry head wound that was inflicted by Appellant and that appeared to be caused by two bullets. Moreover, the actions of Appellant and Nicole to conceal the bodies of Hoover and Bruns under Appellant's trailer and their efforts to clean up and tamper with the crime scene are not indicative of reasonable conduct and would tend to show a "consciousness of guilt" on their part. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000); *see also Miller v. State*, 177 S.W.3d 177, 184 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (defendant's actions of burying gun and burning clothes he was wearing supported jury's rejection of self-defense); *Valdez v. State*, 841 S.W.2d 41, 43 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd) (defendant's actions of changing clothes, hiding gun, and disposing of the bullets supported jury's rejection of self-defense).

From the evidence presented at trial, a rational jury could have found that Appellant's use of force was neither reasonable nor justified. The jury was entitled to disbelieve Appellant's version of events, particularly in light of his and Nicole's inconsistent and conflicting statements. Indeed, the jury could have determined from the evidence that Appellant's belief that deadly force was immediately necessary to protect himself, or Nicole, was not a reasonable belief. In the absence of evidence in the record indicating that the jury was irrational in their rejection of Appellant's claim of self-defense, we decline to substitute our view of the witnesses' credibility for that of the jury. *See Saxton*, 804 S.W.2d at 914. As we have said, it was the jury's function to assess the credibility of all witnesses and to weigh the evidence. Here, the jury's determination of Appellant's guilt is tantamount to a

rejection of his claim of self-defense, and the jury was free to reject this defense and Appellant's version of events. *See Braughton*, 569 S.W.3d at 609; *Saxton*, 804 S.W.2d at 914; *see also Febus*, 542 S.W.3d at 572. Furthermore, the statements of Appellant and his witnesses do not conclusively prove a claim of self-defense. *See Smith v. State*, 355 S.W.3d 138, 146 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

Viewing the evidence in the light most favorable to the jury's verdict, we hold that the State adduced sufficient evidence from which a rational trier of fact could have found, beyond a reasonable doubt, all of the essential elements of murder and also could have found against Appellant on his claim of self-defense. Accordingly, we overrule Appellant's fourth issue.

*B. Judicial Commentary*

In his first issue, Appellant complains that the trial court, in the presence of the jury, directed several admonishments and other critical statements to Appellant's trial counsel. It is Appellant's contention that those remarks improperly influenced the jury's decisions and unfairly prejudiced him. Appellant references several instances in which the trial court either admonished or expressed displeasure with Appellant's trial counsel in the presence of the jury. As such, it is Appellant's belief that the trial court's comments insinuated and created an impression with the jury that Appellant's trial counsel was dishonest and was manipulating the judicial process. After a thorough review of the record, we disagree. *See Trung The Luu v. State*, 440 S.W.3d 123, 129 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ("The scope of our review is the entire record." (citing *Dockstader v. State*, 233 S.W.3d 98, 108 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd))).

A defendant has a due process right to a fair and impartial trial before a neutral and independent judge. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006); *see Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no

pet.). It is presumed that the trial court's actions during trial were correct, and a clear showing of bias is required to overcome this presumption. *Brumit*, 206 S.W.3d at 645. Therefore, to find reversible error on the ground of improper judicial conduct or comments, we must conclude (1) that some form of judicial impropriety was in fact committed and (2) that such impropriety resulted in probable prejudice to the complaining party. *Dockstader*, 233 S.W.3d at 108.

"Judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Trung The Luu*, 440 S.W.3d at 129; *see Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001) ("[A] trial judge's irritation at the defense attorney does not translate to an indication as to the judge's views about the defendant's guilt or innocence."). "Such remarks may constitute bias if they reveal an opinion deriving from an extrajudicial source; however, when no extrajudicial source is alleged, such remarks will constitute bias only if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Dockstader*, 233 S.W.3d at 108 (citing *Markowitz v. Markowitz*, 118 S.W.3d 82, 86 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)).

As Appellant's trial counsel began his cross-examination of Ranger Vandygriff, the trial court sustained an objection asserted by the State. The trial court then directed the following remarks to Appellant's trial counsel in the jury's presence: "Ask your question. Do not do your jury arguments until jury argument time. This is a time to ask questions. It's not the time to continually try to stress something that is not an evidentiary issue. Get to the evidence." This interaction led to further discussion in the presence of the jury between the trial court and Appellant's trial counsel:

> [DEFENSE COUNSEL]: Your Honor, at this time I would ask the Court to instruct the jury that any expression of anger or displeasure

16

with the Defense attorney should have no weight or bearing on their decision on the case[.]

THE COURT: Then don't raise the displeasure of the Court in an intentional effort to misdirect or misguide this Court. Now, if you want to proceed, you proceed. If not, we'll let somebody else.

[DEFENSE COUNSEL]: Well, Judge, you just made a comment that I made an intentional effort to misdirect, and that's just not a true statement. There was -- I'm not trying to misdirect anybody. I'm trying to get at the truth and to justice in this case.

THE COURT: Then ask questions to establish evidence and do not make your jury arguments during your questions. The objection is sustained.

[DEFENSE COUNSEL]: Well, I would like to make -- have a ruling on my request for you to instruct the jury that they're not to use your displeasure expressed towards me for any consideration whatsoever in their deliberations.

THE COURT: Your motion is overruled. Sit down --

[DEFENSE COUNSEL]: Thank you.

THE COURT: -- and proceed.

Later, during the same cross-examination, and after the trial court had sustained a series of hearsay objections raised by the State, Appellant's trial counsel asked Ranger Vandygriff another question and then immediately asked the prosecutor: "Did you want to object to hearsay?" This comment by Appellant's trial counsel precipitated the following exchange in the jury's presence:

THE COURT: Just a second. I'm going to object to hearsay. That has nothing to do with anything. You told me last night you were not going to ask questions that were not admissible for the sole purpose of dragging things out. You told me this witness would be through very shortly this morning as we discussed scheduling at your request. These questions have --

17

[DEFENSE COUNSEL]: Your Honor, I object to this admonishment in front of the jury talking about things that were talked about outside the presence of the jury. It's just not fair.

THE COURT: What's not fair is to intentionally ask over and over --

[DEFENSE COUNSEL]: That's not what I'm doing, Judge. That's not fair for you to say that in front of the jury, and I make a Motion for Mistrial.

THE COURT: Denied.

[DEFENSE COUNSEL]: I'm trying my best. This man is on trial for his life, and I'm trying to defend him to the best of my ability. And my ability may not be as good as some lawyers that you have, but it's the best I got.

THE COURT: Whether it's your ability or not you are to comply with the law, and the law of evidence does not permit somebody to ask what did somebody else tell somebody else and you tell me. That's hearsay.

After this colloquy, the jury was excused for a break. Appellant's trial counsel thereafter re-urged his motion for mistrial and presented additional objections claiming that the trial court had made these comments[2] "out of [its] anger towards [defense counsel]" and that, because "[t]his Judge is a Judge of a small town and a small county and apparently carries a lot of power and influence," these comments could unfairly influence the jury and deny Appellant a fair trial. The trial court, again, denied the motion for mistrial. The trial court reminded Appellant's trial counsel that they had previously discussed time management expectations for the

---

[2]Appellant's trial counsel also complained that the trial court had made various facial expressions in the jury's presence that were clearly indicative of its disapproval of trial counsel. Appellant's trial counsel requested a jury instruction that "any disapproval [the jury] may interpret from your facial expressions" or "any perceived disapproval of me by the Court is not to be considered as a comment on the weight of the evidence." The trial court denied the request. As Appellant notes, this discussion occurred outside the presence of the jury. Irrespective of the setting, we do not find that the trial court's comments in this instance reached the level of clear bias. *See Jasper*, 61 S.W.3d at 421.

18

examination of certain witnesses, which the trial court now believed that trial counsel was flouting. The trial court then stated:

> And then for you to ask questions that are totally irrelevant . . . . What those witnesses say or said in statements to an officer or another officer is obviously hearsay. Their testimony could possibly be admissible, but there are ways for you to get that into evidence in a proper way rather than to just drag out through inappropriate or improper questions. Drag out the time involved with this particular witness. And then for you to knowingly do so and evidence that by turning to the -- another attorney in this case and let them know that you knew it was inappropriate by saying, "Well, aren't you going to object to hearsay?" was a point past which I didn't believe and I do not believe should have been taken, and I admonished you not to do that.

"The trial court has great discretion in conducting the trial." *Haynes v. Union Pac. R.R. Co.*, 598 S.W.3d 335, 350 (Tex. App.—Houston [1st Dist.] 2020, pet. abated) (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240–41 (Tex. 2001)); *accord Jasper*, 61 S.W.3d at 421. In his discretion, a judge may lawfully provide guidance and manage the presentation of evidence without abandoning his role as a neutral and independent arbiter. *Strong v. State*, 138 S.W.3d 546, 552 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.); *see* TEX. R. EVID. 611(a). Nonetheless, even "a stern and short-tempered judge's ordinary efforts at courtroom administration" are "'within the bounds' of human imperfection" and will not support a claim of judicial bias. *Gonzalez v. State*, No. AP-77,066, 2020 WL 6482409, at *55 (Tex. Crim. App. Nov. 4, 2020) (quoting *Liteky v. United States*, 510 U.S. 540, 556 (1994)).

Appellant relies on *Blue v. State* for the proposition that, in a trial setting, the trial judge has significant influence over the jury. *See Blue v. State*, 41 S.W.3d 129, 131 (Tex. Crim. App. 2000) (plurality op.). In *Blue*, a plurality of the court concluded that the trial court's comments to the jury venire that suggested that the trial court would have preferred for the defendant to plead guilty constituted

fundamental error and tainted the presumption of innocence. *Id.* at 131–32. We agree with this proposition. However, unlike the scenario in *Blue*, Appellant's arguments in this case and his cited examples of alleged improper judicial commentary cannot be characterized as one of the "few cases where the judge's statements when viewed objectively are so egregious as to render him biased." *Blue*, 41 S.W.3d at 138 (Keasler, J., concurring).

Here, the trial court's comments that the conduct of Appellant's trial counsel constituted "an intentional effort to misdirect or misguide this Court" and that "[y]ou told me last night you were not going to ask questions that were not admissible for the sole purpose of dragging things out," when taken in context, are indicative of the trial court's frustration and the apparent misunderstanding as to how the trial court and Appellant's trial counsel believed the order of trial should proceed. The trial court clearly expressed its impatience with the manner in which Appellant's trial counsel examined certain witnesses and the methods and purposes utilized by him to offer evidence. It is also equally apparent that the trial court's admonishments and perceived irritation with Appellant's trial counsel were related to and focused on the presentation of evidence, the need for effective time management, and the trial court's intention of conducting an efficient trial, and not on the guilt or credibility of Appellant or the defense that he and his trial counsel presented at trial. *See Jasper*, 61 S.W.3d at 421; *Wilson v. State*, 473 S.W.3d 889, 903–04 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd).

Notwithstanding Appellant's complaints, we believe it should be noted that, as a general rule of thumb, a trial court should refrain from expressing or directing comments or admonishments of this nature to trial counsel in the presence of the jury. *See Joshlin v. State*, 488 S.W.2d 773, 776 (Tex. Crim. App. 1972) ("If the conduct of counsel is such that repeated admonishments are called for, it is perhaps better practice to do so in the absence of the jury."); *see also Burris v. State*, 276

S.W.2d 260, 263 (Tex. Crim. App. 1953). We understand the frustration that at times is experienced by a trial court. We also understand that a trial court's need to admonish trial counsel may at times be invited, necessary, or even justified; however, alternative methods exist, and should be considered, to effectively and professionally address these situations. Here, although the trial court's comments did not reach the level of clear bias, the more appropriate manner and forum in which to address such commentary would have been in a setting without the jury's presence. *See Joshlin*, 488 S.W.2d at 776; *Burris*, 276 S.W.2d at 263. Nevertheless, the trial court's failure to do so in this case, without more, did not render the trial court's commentary biased. *See, e.g.*, *Jasper*, 61 S.W.3d at 421 ("[A] trial judge's irritation at the defense attorney does not translate to an indication as to the judge's views about the defendant's guilt or innocence."); *Williams v. State*, 191 S.W.3d 242, 252–53 (Tex. App.—Austin 2006, no pet.) ("The trial court may declare in the jury's presence that a statement is 'not the law.'"); *Watson v. State*, 176 S.W.3d 413, 418–19 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (holding trial court's comments in the presence of the jury criticizing a pro se litigant's decision not to be represented by counsel did not vitiate the presumption of innocence).

Moreover, and importantly, we do not believe that the trial court's challenged commentary prejudiced Appellant or unfairly influenced the jury. *See Dockstader*, 233 S.W.3d at 108; *Simon v. State*, 203 S.W.3d 581, 595 (Tex. App.—Houston [14th Dist.] 2006, no pet.) ("In assessing the impact of a trial court's improper comments, a reviewing court is concerned with whether the jury would be unfairly influenced by additional comments from the bench." (citing *Strong*, 138 S.W.3d at 553)). Appellant killed Bruns and Hoover. He was acquitted of the murder of Bruns. Even though the jury convicted him of Hoover's murder, the jury also affirmatively found that Appellant acted under the immediate influence of "sudden passion" and assessed the minimum sentence of two years' imprisonment. Unquestionably, for

Appellant, in the absence of being acquitted for Hoover's murder, the result of this trial could not have been more favorable.

In light of Appellant's complaints of alleged judicial improprieties, we are mindful that the guiding principles of our profession dictate that trial counsel and judges should be courteous to and respectful of each other and should avoid the urge to unnecessarily or improperly attack and criticize the other. *See, e.g.*, TEX. CODE JUD. CONDUCT, Canon 3(B)(4), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. C (West 2019). Trial counsel and judges have an equal responsibility to protect the dignity and independence of the court, the decorum of court proceedings, and the legal profession. Neither trial counsel nor the trial judge should engage in conduct that could be construed as offensive to the court, its proceedings, its rulings, or the legal profession. Trial judges are gatekeepers and managers of the courtroom. Above all else, they should be neutral arbiters. It is their primary role to effectively manage trial proceedings, to rule on objections asserted by the parties, and to instruct juries on the law applicable to each case. Similarly, trial counsel's conduct should adhere to the highest levels of professionalism. *See, e.g.*, TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶ 4, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (West 2019) (Tex. State Bar R. art. X, § 9) ("A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials."). As such, trial counsel should refrain from engaging in conduct that is designed or intended to agitate or offend the court or impugn the judicial process. *See generally* TEX. LAWYER'S CREED—A MANDATE FOR PROFESSIONALISM (1989), *reprinted in* TEXAS RULES OF COURT 737 (West 2020).

Here, we conclude that, in context and in totality, the trial court's challenged comments did not demonstrate a high degree of favoritism or antagonism, nor did they rise to such a level as to vitiate the impartiality of the jury or affect the presumption of innocence due Appellant. *See Liteky*, 510 U.S. at 556; *Jasper*, 61

S.W.3d at 421; *Dockstader*, 233 S.W.3d at 108. We cannot discern from the record the demeanor, the voice inflections, or the overt conduct exhibited by the trial court and Appellant's trial counsel during the challenged exchanges, or any other characteristic that would be indicative of the trial court's alleged anger or impatience. Furthermore, we cannot determine from our review of the "cold" record if Appellant's trial counsel presented an argumentative or surly attitude toward the trial court and the judicial process. If so, perhaps admonishments by the trial court would have been appropriate. Trials, at times, can become contentious. Some may even describe trials as battle or war. Regardless of the circumstance, civility should rule the day, and the interactions between trial counsel and the trial court should never become adversarial. Metaphors aside, we believe that the trial court in this case did not cross the line, as Appellant suggests. Therefore, based on the record before us, we cannot conclude that Appellant was deprived of his right to a fair and impartial trial before a neutral and detached judge. Accordingly, we overrule Appellant's first issue.

### C. Evidentiary Issues – Standard of Review

In his remaining four issues—Appellant's second, third, fifth, and sixth issues—Appellant asserts that the trial court erred when it admitted, or refused to admit, certain evidence. We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010); *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)); *Walter v. State*, 581 S.W.3d 957, 977 (Tex. App.—Eastland 2019, pet. ref'd). This same standard applies when we review a trial court's decision to admit or exclude extraneous evidence. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009).

We will not reverse a trial court's decision to admit or exclude evidence, and there is no abuse of discretion, unless that decision lies outside the zone of reasonable disagreement. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *De La Paz*, 279 S.W.3d at 343–44; *Cameron*, 241 S.W.3d at 19; *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005); *Walter*, 581 S.W.3d at 977. Furthermore, we will uphold a trial court's evidentiary ruing if it is correct on any theory of law that reasonably finds support in the record and is applicable to the case. *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016); *Gonzalez v. State*, 195 S.W.3d 114, 125–26 (Tex. Crim. App. 2006); *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); *Dering v. State*, 465 S.W.3d 668, 670 (Tex. App.—Eastland 2015, no pet.).

*1. Evidence in the Safe*

As we have noted, approximately eight months after Bruns and Hoover were killed, a safe was recovered on the property of a business adjacent to Appellant's trailer. Among other things, drugs, drug paraphernalia, and a wallet with Nicole's identification were found in the safe. In his second and third issues, Appellant contends that the trial court erred when it admitted these items because such evidence was not relevant and was unfairly prejudicial. We agree.

Evidence is relevant if it has any tendency to make a fact of consequence to the determination of the action more or less probable than it would be without the evidence. TEX. R. EVID. 401. "Generally, all relevant evidence is admissible." *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009) (citing TEX. R. EVID. 402). Because Rule 403 favors the admissibility of relevant evidence, it is presumed that relevant evidence will be "more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389; *see* TEX. R. EVID. 403; *see also De La Paz*, 279 S.W.3d at 343. Even "marginally probative" evidence should be admitted if "it has any tendency at all, even potentially, to make a fact of consequence more or less likely." *Fuller v. State*,

24

829 S.W.2d 191, 198 (Tex. Crim. App. 1992), *abrogated on other grounds by Riley v. State*, 889 S.W.2d 290, 301 (Tex. Crim. App. 1993).

The trial court concluded that the evidence recovered from the safe was relevant and admissible for impeachment purposes and because it pertained to Appellant's claim of self-defense. Appellant's claim of self-defense required a showing that his use of deadly force was reasonable. *See* PENAL § 9.32(a). In connection with its trial strategy to prove that Appellant's use of deadly force was not reasonable under the circumstances, the State offered this evidence to show that Appellant was involved in criminal activity, namely the possession of illegal drugs, at the time he was engaged in his allegedly defensive actions. *See id.* § 9.32(b)(3). Here, the admission of the evidence recovered from the safe did not tend to make it more probable that Appellant was engaged in criminal activity by possessing illegal drugs because Appellant, in fact, admitted to using illegal drugs that night. *See Fuller*, 829 S.W.2d at 198. Furthermore, none of the evidence recovered from the safe was directly linked to Appellant. Rather, the wallet contained Nicole's identification, not Appellant's, and both Appellant and Nicole had stated that the drugs belonged to her.

It is also apparent that the evidence that was recovered from the safe was not relevant to Appellant's claim of self-defense. Nor was this evidence relevant for impeachment purposes because, as we have noted, none of it could be linked to Appellant. Furthermore, because Appellant candidly admitted to using illegal drugs on a daily basis, this evidence could not have been legitimately used for impeachment purposes. *See id.* Therefore, we conclude that the evidence recovered from the safe was not relevant to any issue in the case and should have been excluded. *See* TEX. R. EVID. 402 ("Irrelevant evidence is not admissible."); *see also Henley*, 493 S.W.3d at 83. Because of our holding on this issue, we need not

determine whether the trial court abused its discretion when it found that this evidence was not unfairly prejudicial. *See* TEX. R. APP. P. 47.1.

Although the trial court erred when it admitted this evidence, we find that such error does not require reversal. *See Perez v. State*, 562 S.W.3d 676, 691 (Tex. App.—Fort Worth 2018, pet. ref'd); *see also* TEX. R. APP. P. 44.2(b). The trial court's erroneous admission of evidence generally constitutes nonconstitutional error. *See Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002); *Reese v. State*, 33 S.W.3d 238, 243 (Tex. Crim. App. 2000). We must disregard a nonconstitutional error if it does not affect a litigant's substantial rights. TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). "[S]ubstantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'" *Motilla*, 78 S.W.3d at 355 (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001)). In assessing the likelihood that the jury's decision was adversely affected by the error, we must "consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Id.*

Despite our conclusion that the evidence recovered from the safe (the drugs, the drug paraphernalia, and the wallet containing Nicole's identification) was not relevant to Appellant's claim of self-defense or the State's proffered theories, we believe that we have fair assurance that the erroneous admission of this evidence did not influence the jury's decisions in this case or, if any, its admission had but a slight effect. Appellant was acquitted of Bruns's murder. As we have discussed, there is sufficient evidence to support Appellant's conviction for the murder of Hoover and

26

the jury's rejection of his claim of self-defense. Whether this unfortunate event arose from "a drug deal gone bad," from an aggravated robbery, or from some other reason, such an event could not be the logical distinguishing factor for the jury to render a verdict of acquittal for one killing and a finding of guilt for the other. Rather, the jury could have reasonably concluded that the distinguishing factor, or factors, was the manner in which Appellant killed Hoover: that is, whether the jury believed that Appellant's use of deadly force against Hoover and Bruns, respectively, was reasonable and justified. *See* PENAL § 9.32(a).

Here, Appellant's description of the encounter indicates that he had gained control of the situation when he stabbed and overpowered Bruns and seized the gun from him. Furthermore, the discrepancies and inconsistencies in the evidence concerning the distance from which Appellant shot Hoover, and the existence of a single entry wound when two bullets were extracted from Hoover's head, could reasonably support the conclusion that is indicated by the jury's verdict: that Appellant, while perhaps acting in self-defense during his struggle with Bruns, exceeded the bounds of reasonable force—and therefore the justification of self-defense or the defense of others—when, using the only gun that was available at the time, proceeded to shoot Hoover until he "knew [Hoover] was dead." As such, the jury could have reasonably believed, and did believe as shown by its verdicts, that the force used by Appellant against Bruns was reasonable and justified but that the force he used against Hoover, under the circumstances, was neither.

Additionally, we note that the trial court included a limiting instruction in the guilt/innocence charge in which the trial court addressed the jury's use and consideration of any extraneous evidence admitted at trial so as to mitigate any potential improper consideration of this evidence by the jury when it was deciding Appellant's guilt. Assuming, without deciding, that the jury considered this evidence for any purpose in determining Appellant's guilt, it is presumed that a jury

27

follows a trial court's instructions regarding the consideration of evidence. Therefore, any potential harm to Appellant would be further mitigated by the trial court's limiting instruction. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009); *Hutch v. State*, 922 S.W.2d 166, 172 (Tex. Crim. App. 1996); *Garcia v. State*, 592 S.W.3d 590, 598 (Tex. App.—Eastland 2019, no pet.); *Hung Phuoc Le v. State*, 479 S.W.3d 462, 472 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

In light of our discussion of this issue on appeal, and based on the record before us, we hold that the trial court's erroneous admission of the evidence recovered from the safe did not affect Appellant's substantial rights. *See Motilla*, 78 S.W.3d at 355; *see also* TEX. R. APP. P. 44.2(b). Accordingly, Appellant's second and third issues are overruled.

### 2. *Bad Acts/First Aggressor*

Finally, in his fifth and sixth issues, Appellant asserts that the trial court erred when it refused to admit evidence proffered by his trial counsel concerning prior bad acts of violence committed by Hoover against McCarter and Kerry. Appellant contends that the proffered evidence was admissible to show motive and to show that Hoover was the first aggressor in this instance. We agree.[3]

Generally, a party may not introduce evidence of specific past conduct of a person to prove conformity of character. TEX. R. EVID. 404(b); *Robbins v. State*, 88 S.W.3d 256, 259 (Tex. Crim. App. 2002) (citing *Montgomery*, 810 S.W.2d at 386–88); *Mozon v. State*, 991 S.W.2d 841, 846 (Tex. Crim. App. 1999); *Tate v. State*, 981 S.W.2d 189, 192 (Tex. Crim. App. 1998). Nevertheless, extraneous evidence may be admissible for other purposes if it has relevance apart from character conformity. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011); *Moses v. State*, 105

---

[3]We address these issues together because, under these facts, the issue of motive is only relevant to whether the victim was the first aggressor. *See Torres v. State*, 117 S.W.3d 891, 894–95 (Tex. Crim. App. 2003); *Torres v. State*, 71 S.W.3d 758, 760–61 (Tex. Crim. App. 2002); *see also* TEX. R. APP. P. 47.1.

S.W.3d 622, 626 (Tex. Crim. App. 2003); *Hernandez v. State*, 426 S.W.3d 820, 825 (Tex. App.—Eastland 2014, pet. ref'd). For instance, such evidence "may be admissible for another purpose, such as proving motive," among other things. TEX. R. EVID. 404(b)(2). Under Rule 405(b), specific instances of conduct are a permissible method to present character evidence in cases in which "a person's . . . character trait is an essential element of a charge, claim, or defense." TEX. R. EVID. 405(b). Although a victim's character trait is generally not an essential element of a claim of self-defense, *Tate*, 981 S.W.2d at 192–93, there are exceptions. One such exception is applicable here.

A defendant who raises the issue of self-defense may introduce evidence of a deceased victim's character trait for violence and other prior violent acts committed by the victim to show that the victim was the first aggressor; to be admissible, the defendant need not be aware of the act. *Ex parte Miller*, 330 S.W.3d 610, 619 (Tex. Crim. App. 2009) (referring to former Rule 404(a)(2), which is now Rule 404(a)(3)(A)); *Torres v. State*, 71 S.W.3d at 758, 760 (Tex. Crim. App. 2002); *Tate*, 981 S.W.2d at 193; *see also* TEX. R. EVID. 404(a)(3)(A), 404(b)(2), 405(a). The prior specific acts of violent conduct may be offered to show, among other things, the deceased victim's state of mind, intent, or motive. *See Ex parte Miller*, 330 S.W.3d at 619; *Torres v. State*, 117 S.W.3d 891, 894–95 (Tex. Crim. App. 2003); *Torres*, 71 S.W.3d at 761.

When evidence of a deceased victim's character trait for violence is admissible, it may be proved by reputation or opinion testimony. *Ex parte Miller*, 330 S.W.3d at 619; *Torres*, 71 S.W.3d at 760; *see* TEX. R. EVID. 405(a). Here, the evidence Appellant sought to admit concerned Hoover's alleged commission of separate incidents of aggravated robberies against McCarter and Kerry. Although McCarter's and Kerry's testimony about these events would not be characterized as either reputation or opinion testimony, under Rule 404(b), "a victim's prior acts of

violence also may be admissible to clarify the issue of first aggressor if the proffered act explains the victim's ambiguously aggressive conduct." *Allen v. State*, 473 S.W.3d 426, 446 (Tex. App.—Houston [14th Dist.] 2015, pet. dism'd); *see Torres*, 117 S.W.3d at 894–95; *Torres*, 71 S.W.3d at 762 ("As long as the proffered violent acts explain the outward aggressive conduct of the deceased at the time of the killing, and in a manner other than demonstrating character conformity only, prior specific acts of violence may be admitted even though those acts were not directed against the defendant.").

To support a claim that the deceased victim was the first aggressor, the defendant must first offer evidence of an actual act of aggression by the victim at the time of the offense. *Dudzik v. State*, 276 S.W.3d 554, 560 (Tex. App.—Waco 2008, pet. ref'd). As such, with respect to the "first aggressor" issue, the victim's prior violent conduct is only admissible (1) if there is some ambiguous or uncertain evidence of a violent or aggressive act by the victim that tends to show the victim was the first aggressor and (2) if the proffered evidence tends to dispel the ambiguity or explain the victim's conduct at the time of the incident. *James v. State*, 335 S.W.3d 719, 728 (Tex. App.—Fort Worth 2011, no pet.) (citing *Mai v. State*, 189 S.W.3d 316, 321 (Tex. App.—Fort Worth 2006, pet. ref'd); *Reyna v. State*, 99 S.W.3d 344, 347 (Tex. App.—Fort Worth 2003, pet. ref'd)); *see also Torres*, 71 S.W.3d at 762 ("For purposes of proving that the deceased was the first aggressor, the key is that the proffered evidence explains the deceased's conduct."). Furthermore, the victim's prior specific acts of violent conduct need not be directed against the defendant to be admissible. *Torres*, 71 S.W.3d at 761–62 (citing *Jenkins v. State*, 625 S.W.2d 324, 325–27 (Tex. Crim. App. [Panel Op.] 1981)).

By bill of exception, Appellant proffered evidence of two separate, prior incidents of aggravated robbery that Hoover allegedly committed against McCarter and Kerry, respectively. Both testified that Hoover had brandished either a knife or

a gun to rob them in the past. McCarter testified that Hoover climbed through his window one night, threatened him with a knife, and took $300 from him, which Hoover claimed he needed to pay for drugs. Kerry, who is an alleged drug dealer, testified that, approximately three months before Hoover's death, two men wearing masks entered her home without her consent, threatened her with a gun, and robbed her. Kerry further testified that she thought Hoover was involved because, during the offense, one of the men called the other "Hoover." After considering Appellant's proffers, the trial court determined that the testimony of McCarter and Kerry should be excluded because their testimony would tend to show character conformity and because the prejudicial effect of its admission would substantially outweigh any potential probative value. *See* TEX. R. EVID. 403, 404(b)(2); *Mozon*, 991 S.W.2d at 846.

In this case, given the applicable presumptions and standard of review, we conclude that the trial court abused its discretion when it excluded the proffered testimony of McCarter and Kerry. This evidence, if admitted, could arguably have supported Appellant's theory that, in light of Hoover's alleged history of violent conduct, Hoover was the first aggressor in this instance. Hoover's unannounced appearance at Appellant's home at 4:00 a.m., wearing a ski mask and dressed in all black clothing, could be construed as an act of aggression. *See Torres*, 117 S.W.3d at 895. In *Torres*, the Court of Criminal Appeals held that the deceased victim's "action of climbing up the second-story balcony, uninvited and unannounced, at 6:30 a.m. constitute[d] an act of aggression" that tended to raise the issue of self-defense. *Id.* The court in *Torres* also concluded that, because the person who saw the deceased victim climbing onto the balcony perceived this action to be aggressive, such evidence was relevant to the determination that the action of the deceased victim was, in fact, aggressive. *Id.* Here, the manner in which Hoover appeared at Appellant's trailer is similar to that of the deceased victim's actions in *Torres*.

Appellant posits that, if the trial court had admitted the proffered testimony of McCarter and Kerry, the jury could have reasonably concluded that Hoover's appearance at Appellant's trailer was an aggressive act. Appellant further claims that the jury could have considered this evidence to determine if Hoover's actions that morning, and his pattern of aggressive behavior, justified Appellant's use of deadly force and tended to support his claim of self-defense. *See id.* Because the jury could have reasonably concluded that Hoover's conduct at Appellant's trailer was aggressive in nature, the trial court erred when it refused to permit Appellant to introduce the proffered testimony of the prior, similar acts of alleged violent conduct committed by Hoover against McCarty and Kerry. Arguably, such evidence could have clarified Hoover's ambiguously aggressive conduct on the night in question in a manner other than to demonstrate character conformity. *See Ex parte Miller*, 330 S.W.3d at 620; *Torres*, 117 S.W.3d at 895–96; *Torres*, 71 S.W.3d at 762 (citing *Tate*, 981 S.W.2d at 193); *James*, 335 S.W.3d at 728; *Reyna*, 99 S.W.3d at 347.[4]

The same harm standard we discussed in addressing Appellant's second and third issues applies equally here, and we need not repeat it. Notwithstanding Appellant's assertions, based on our review of the record as a whole, we conclude that the trial court's erroneous exclusion of the proffered testimony of McCarty and Kerry did not affect Appellant's substantial rights. *See Motilla*, 78 S.W.3d at 355; *Perez*, 562 S.W.3d at 691; *see also* TEX. R. APP. P. 44.2(b). As we have said, the jury was not required to accept Appellant's version of events or any of the evidence

---

[4]Furthermore, a trial court may, under Rule 403, exclude evidence that is otherwise admissible under Rule 404 if the court finds, on balance, that the prejudicial effect of such evidence substantially outweighs its probative value. TEX. R. EVID. 403; *see also Casey v. State*, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007); *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). Here, the trial court expressly stated that the basis for its Rule 403 exclusion was because neither episode proffered by Appellant proved motive. Because we have concluded that Appellant's proffered evidence would be admissible to show motive with reference to the question of whether Hoover was the first aggressor, we also conclude that the trial court's Rule 403 balancing analysis, as expressly characterized by the court, was erroneous.

offered by him at trial. As such, in light of the record before us, we believe that we have fair assurance that the trial court's exclusion of this evidence did not influence the jury's decisions in this case or, if any, its exclusion had but a slight effect. Accordingly, we overrule Appellant's fifth and sixth issues.

III. <em>This Court's Ruling</em>

We affirm the judgment of the trial court.


W. STACY TROTTER

JUSTICE


February 26, 2021

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.